**DOWNIE et al. v. POWERS et al.**

No. 4282.

United States Court of Appeals
Tenth Circuit.

Dec. 20, 1951.

762

Hayden C. Covington, Brooklyn, N. Y., for appellants.

Jerome Sullivan and Edward L. Bond, Duncan, Okl. (C. D. Cund, Duncan, Okl., was with them on the brief), for appellees.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

Appellants brought this action in the United States District Court of Oklahoma to recover damages for injuries alleged to have been sustained in the deprivation of their civil rights by the appellees. Jurisdiction is conferred under 28 U.S.C.A. § 1343.

Appellants are all Jehovah's Witnesses. The appellee Webb is the Chief of Police of the City of Duncan, Oklahoma; the appellee Powers is one of the Commissioners of the City of Duncan; the appellee Wood is the Superintendent of Schools for the City of Duncan; and, the other appellees are citizens of that City.

During the Spring of 1949, the Jehovah's Witnesses planned a district convention in the City of Duncan and obtained a lease of the Duncan High School auditorium beginning July 15 and ending July 17, 1949. The complaint alleges that on July 17, when appellants had assembled for their meeting in the auditorium where an address was to be delivered, "the defendants armed with sticks, rocks, guns and other instruments of violence, entered the auditorium forcibly, and attacked the assembled groups and broke up the assembly."

As we construe the complaint, it seeks a single recovery on two separate, but not inconsistent legal theories. First, it is alleged that by their wilful failure and refusal to perform the duties enjoined upon them by state law, to keep the peace, City Commissioner Powers and Chief of Police

Webb, affirmatively deprived plaintiffs of their rights, protected by the First and Fourteenth Amendments to the Federal Constitution, in violation of Section 1 of the Civil Rights Act, 17 Stat. 13, 8 U.S.C.A. § 43. Then it is alleged that all of the defendants, including the city officials, formed a conspiracy to deprive the plaintiffs of equal protection of the law, or of equal privileges and immunities under the law, in violation of Section 2 of the Act, supra. 8 U.S.C.A. § 47(3).

At the conclusion of all the evidence the plaintiffs moved for a directed verdict on all of the issues except the amount of damages. The court overruled the motion and the jury returned a verdict for all of the defendants. Plaintiffs have appealed from a judgment on that verdict, contending first, that the evidence conclusively shows that City Commissioner Powers and Chief of Police Webb, acting under color of law, deprived them of their privileges and immunities secured against state action by the Fourteenth Amendment; and secondly, that the evidence conclusively proves the alleged conspiracy under Section 2 of the Civil Rights Act.

Marshalling the evidence in their behalf, appellants call attention to the official order to remove their street banners, as indicating official hostility, and to the fact that the police were warned and alerted to the threatened action of the citizen defendants. Specifically, they call attention to the use of a sound equipped automobile by some of the appellants on Sunday, exhorting the "red blooded Americans" of Duncan to come to the High School auditorium and "fight for the flag" and "your Country"; to the altercation between one of the appellants and defendant March; and, to the fact that one of the Jehovah's Witnesses went to the City Jail to invoke protection of the law for himself and his brethren. Then it is said that although forewarned, Webb did nothing to prevent the formation of the mob, which on Sunday afternoon forcibly entered the auditorium to break up the religious assembly. It is charged that when the rioting broke out Webb and Powers came to the auditorium in their capacity as City officials, but did nothing whatsoever to quell the riot or restore order, and that order was restored only after one of the Jehovah's Witnesses called the City Firemen, who quenched the violence with the water hose. Apellants urge, that by this wilful failure to keep the peace or restore order, the City officials affirmatively deprived them, under color of law, of constitutionally protected rights, and that they are therefore entitled to recover from these appellees as a matter of law.

In submitting the case to the jury, it was told in language too clear for mistake that the appellants, as Jehovah's Witnesses, had the constitutionally protected right to peaceably assemble for the purpose of pursuing their religious beliefs and that the defendant city officials had the duty to exercise all reasonable diligence to vouchsafe those rights to the plaintiffs; and, that a purposeful dereliction of their duty would be a misuse or nonuse of their powers, amounting to action taken under color of state law, custom or usage. But, the jury was also told that the defendant officials were not required to insure the safety of the plaintiffs or to guarantee the exercise of their civil rights. That if it believed from a preponderance of the evidence that the officials used reasonable diligence to prevent violence they should find for them.

Under Oklahoma law "Every person who wilfully prevents, by threats or violence, another person from performing any lawful act enjoined upon or recommended to such person by the religion which he professes, is guilty of a misdemeanor." 21 O.S.A. § 914. "Every person who wilfully disturbs, interrupts or disquiets any assemblage of people met for religious worship * * * by * * * any unnecessary noise, either within the place where such meeting is held, or so near it as to disturb the order and solemnity of the meeting" is guilty of a misdemeanor. 21 O.S.A. Sections 915 and 916. And, a police officer may arrest any such person or persons without a warrant. 22 O.S.A. § 196.

■ Chief of Police Webb having the direction of the Police in the City of Duncan, was under the statutory duty to order

a force sufficient to preserve the peace at the religious meeting of the appellants, if he was "satisfied that a breach of the peace is reasonably apprehended." 22 O. S.A. § 82. And when the rioters gathered at the place of the public meeting it became his statutory duty to go among them, or as near to them as possible, and command them in the name of the State, to immediately disperse. 22 O.S.A. § 101. If they did not immediately disperse, he had the duty to arrest them or cause them to be arrested, and for that purpose could command the aid of all persons present or within the county. 22 O.S. A. § 102.

■■■ The Sunday meeting of the Jehovah's Witnesses in the Auditorium was a religious meeting, so recognized by the law of Oklahoma. Cline v. State, 9 Okl.Cr. 40, 130 P. 510, 45 L.R.A.,N.S., 108. And, a wilful or purposeful failure of the Chief of Police or other City officials to preserve order, keep the peace, and to make the Jehovah's Witnesses secure in their right to peaceably assemble, would undoubtedly constitute acquiescence in, and give color of law to, the actions of the mob. One charged with the duty of keeping the peace cannot be an innocent bystander where the constitutionally protected rights of persons are being invaded. He must stand on the side of law and order or be counted among the mob. United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368; Catlette v. United States, 4 Cir., 132 F.2d 902; Lynch v. United States, 5 Cir., 189 F.2d 476. But the officials are the keepers, not the insurers of the peace in the community. Diligent and conscientious effort is all that is required. Otherwise, officers would be civilly and criminally liable under Federal law for every breach of a constitutionally protected right of a citizen—a result which the framers of the Civil Rights Act obviously never intended.

Chief of Police Webb testified that he took all the steps he deemed appropriate or necessary to assure an orderly assembly. He stated that on Sunday morning both the afternoon and morning police force were on duty; that finding everything quiet and peaceful at the auditorium he permit-

ted his night force to go home for rest, but ordered them to return to duty Sunday afternoon. At the suggestion of appellants he alerted the Highway Patrol, who stood by at the edge of the City in communication by two-way radio.

City Commissioner Powers testified that on Sunday afternoon he was enroute to the airport when he observed a crowd at the auditorium. He followed the firemen into the auditorium and assisted them in stopping the riot, after asking all the women and children to leave the meeting.

A number of the Duncan citizens attending the meeting to which the public had been invited, were not bent upon disturbance, but apparently went to the auditorium out of curiosity. When the three or four townsmen entered the auditorium with the flag, demanding that the Jehovah's Witnesses salute it, general pandemonium broke out, resulting in violence. There were many and varied versions of the immediate cause of the riot, as well as what occurred. There were seventy-five Witnesses, and all of them gave different opinions as to what happened at the time. When the disturbance started, Chief of Police Webb was in his office with the City Manager and the Mayor, conferring on the situation. When the fire alarm came in Webb went to the auditorium. He started shouting to the crowd "Let's quiet down. Let's let the service go ahead." After the rioting was quelled Webb remained at the auditorium until after the speaker had finished his address and the meeting was over. There is evidence of some further disturbance in the form of window slamming and walking about among the audience and on the stage. This is either denied, explained or minimized.

■■■ When all the evidence bearing upon the action or inaction of the city officials is considered in its totality we think it presented a factual issue of whether they exercised reasonable diligence in the performance of their statutory duties, or whether they abdicated to the mob. The issue was submitted to the jury under proper instructions and their findings have binding effect here, even though as triers

of the fact we might have concluded otherwise.

On the issue of actionable conspiracy, the jury was instructed that the guarantees of the Fourteenth Amendment relate only to action by the State and not to any action by private individuals, and that the Civil Rights Act granted redress for the deprivation of only that which the Fourteenth Amendment guarantees. The jury was accordingly told that only Powers and Webb could have entered into a conspiracy to deprive the appellants of their civil rights without the necessity of any other defendant being a party to such conspiracy, if any; and that the jury could not therefore return a verdict against any individual defendant, except Powers and Webb, unless they found by a preponderance of the evidence that such individual defendant entered into a conspiracy with either Powers or Webb, or both of them, to deprive the plaintiffs of some one of their civil rights, and that such conspiracy was successfully consummated. The net effect of this instruction was to tell the jury that color of state law is an essential ingredient of an actionable conspiracy under Section 2 of the Civil Rights Act, 8 U.S.C. A. § 47(3), and that the complicity of either Webb or Powers, or both of them, was therefore essential to the validity of the asserted cause of action.

■■■ It cannot be doubted that the Fourteenth Amendment "erects no shield against merely private conduct, however discriminatory or wrongful." Shelley v. Kraemer, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161. And since Collins v. Hardyman, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253, there can be little doubt that the Civil Rights Act grants redress only for that which the Fourteenth Amendment condemns and forbids. See also Viles v. Symes, 10 Cir., 129 F.2d 828; Ferrer v. Fronton Exhibition Co., 5 Cir., 188 F.2d 954; Love v. Chandler, 8 Cir., 124 F.2d 785. It follows that there can be no conspiracy of private citizens to, under color of law, deprive a person of his constitutionally protected rights, unless such conspiracy results in a complete breakdown of law and order in which the conspirators take the law into

their own hands, thereby converting the law of the mob into the law of the State. Then, and then only, says the Supreme Court, can redress be given under Section 2 of the Civil Rights Act for the deprivation of a constitutionally protected right by private citizens. Collins v. Hardyman, supra, 341 U.S. at pages 661, 662, 71 S.Ct. at pages 941, 942.

■■ Appellants apparently concede this construction of Collins v. Hardyman, supra, but earnestly urge that during the weekend of July 15, 16 and 17, law enforcement in the City of Duncan was paralyzed by fear of the local uprising, generated by the sentiment against the Jehovah's Witnesses. The answer to this contention is that the violence was suppressed and the assembly proceeded to an orderly conclusion. Whether order was established by Webb and Powers, the City firemen, or some other agency, the fact is that there was no complete breakdown of law to the extent that mob violence prevailed.

It would serve no useful purpose to recount for this record the inexcusable behavior of those who participated in the shameful incident at the auditorium on Sunday afternoon. The undeniable fact is that citizens of the City of Duncan marched into the auditorium while the religious meeting was in progress for the purpose of disrupting the meeting and depriving those assembled of their constitutionally protected rights. It is sufficient in the light of what we have already said concerning the conduct of the City officials, that the evidence on the whole presented an issue of fact whether they joined the conspiracy or participated therein to give it the requisite color of law. The jury likewise resolved this issue against the plaintiffs and its findings in this respect are conclusive here.

At the suggestion of the trial court and on the day before submission of the case to the jury, appellants and appellees submitted requested instructions. Appellants' requested instructions were approximately 36 in number, bearing upon all phases of the case. At the conclusion of the evidence counsel for appellants requested the

court to indicate what instructions would be given "so we might know what issues must be argued to the jury, and what we are entitled to know generally what the Court is going to charge the jury." The court replied that it would instruct the jury after argument, and that it "would note on each requested instruction whether or not it is accepted or whether or not it is denied or given in part or in substance, or whatever it is. It will be noted on each instruction." Again counsel asked the court to indicate "pursuant to the rule what instructions will be given", to which the court replied, "I don't know of any such rule. We have no such rule in the Federal Courts." In the colloquy that followed, the court stated that counsel would be entitled to know what the court's charge would be in State court, but not in the Federal court where instructions are given after argument. Counsel persisted that he would like to know which of his requested instructions would be given and which would be refused. When the court replied that he could not give him that information, counsel said "Can we take time enough here—", and the court interrupted, saying "No, I want to get through with this case." Counsel then asked the court if it had found an opportunity to read the instructions, and the court stated that it had read them and approved many but that some were repetitious and confusing. Counsel then stated "I would like, if you know which ones you are going to give, for you to let me know so I might intelligently argue the case." The court replied "You ought to know what the law is." The record indicates that all this colloquy occurred in chambers.

Rule 51 of the Civil Rules of Procedure, 28 U.S.C.A., provides in part: "At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. *. * *."

The requirements of Rule 51 are too plain for misunderstanding. Its purpose, as an aid in the administration of justice is equally plain. By the tender of requested instructions prior to, or at the close of the evidence, the trial judge is informed as to each of the party's theory of the law of the case. He is thereby enabled to frame his instructions with an eye to the contending views of the law. Many states require their courts to instruct the jury before argument and to positively indicate what requested instructions will be given as well as those refused. See 12 O.S.A. § 575 (6) and (7). But, notwithstanding the Conformity Act of June 1, 1872, 17 Stat. 197, the Federal courts have always felt free to follow the common law practice of instructing the jury after argument of counsel. Shepard v. Adams, 168 U.S. 618, 18 S.Ct. 214, 42 L.Ed. 602; Nudd v. Burrows, 91 U.S. 426, 23 L.Ed. 286; Western Union Tel. Co. v. Burgess, 6 Cir., 108 F. 26, certiorari denied 181 U.S. 620, 21 S. Ct. 924, 45 L.Ed. 1031. This procedure has been thought to be a prerogative of the Judge, as Governor of the trial and a functionary of the administration of justice. Ohlinger Federal Practice, Vol. 3, p. 642.

 But to enable counsel to intelligently argue the facts on the law of the case, it has always been considered good practice for the court to informally advise counsel before argument generally what its instructions would be on controverted questions of law. This concept of good practice was carried over into the Federal Rules of Civil Procedure in Rule 51. The procedural rules are designed, however, to promote effective trial practice—they are but aids in the administration of justice and we are admonished to disregard "any error or defect in the proceeding which does not affect the substantial rights of the parties." Rule 61, 28 U.S.C.A.

 No one would say that failure to literally comply with the requirements of the Rule would be reversibly erroneous. We know as a practical matter that most requested instructions are colored with the advocate's view of his client's cause, and

cannot be given in the requested language. Moreover, the instructions are not required to be in writing or in the abstract. Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321. They should be, and usually are, given orally, in logical sequence and in the "common speech of man", so that the laymen to be guided thereby, will have an intelligent understanding of their true meaning.

It would seem, therefore, that good practice would require the court to do no more than inform counsel generally as to its views on the requested instructions. See Levin v. Joseph E. Seagram & Sons, 7 Cir., 158 F.2d 55. But, the court cannot act arbitrarily. It cannot assume that counsel will know what the instructions will be, and counsel is not required to speculate at the risk of having his argument nullified or its effectiveness impaired by the court's subsequent charge to the jury. If after argument of counsel, the court changes its mind or ultimately gives an instruction, or the substance of an instruction, it has indicated it will not, or fails to give an instruction which it has indicated it will, counsel should be given an opportunity, if justice requires, to reargue the facts in the light of the changed law of the case. See Terminal R. Association of St. Louis v. Staengel, 8 Cir., 122 F.2d 271, 136 A.L.R. 789.

Here, the trial court refused after repeated requests, to indicate which of the requested instructions would be refused and which would be given, or to indicate generally what his instructions would be. This is not an ordinary case in which the law is settled by adjudicated cases. It involves a conspiracy to violate civil rights in which private persons are alleged co-conspirators with public officials. There was a contrariety of views concerning the applicable law of the case, and the questions were not authoritatively settled until after trial. See Collins v. Hardyman, supra. The applicable law of the case undoubtedly entered into and affected the course of the argument to the jury. Counsel did not know what those instructions would be until after his argument, and we think in these circumstances, the failure of the court to observe either the letter or the spirit of the rule was prejudicial error.

Appellants also complain of the refusal of the court to afford their counsel an opportunity to take his exceptions to the instructions out of the hearing of the jury. Rule 51 provides that such an opportunity "shall be given". The court denied the request because "that is not the way the court is conducted. They must be made in the presence of the jury and before the jury retires."

The purpose of this rule is to afford counsel full opportunity to state frankly and fully his objections to the instructions without influencing or confusing the jury on matters about which it has no concern. Ohlinger's Federal Practice, Vol. 3, p. 646. Without determining whether the court's disregard of this part of the rule amounted to prejudicial error, we are content to say here that in our view, the better, and we think accepted, practice is to allow all objections and exceptions to the instructions in the absence of the jury but before final submission. See Apple v. Schweke, 7 Cir., 172 F.2d 633.

Appellants requested 36 separate instructions and excepted to the court's refusal to give most of them. Particularly they complain of the instruction of the court to the effect that if the disturbance was not the result of the alleged conspiracy, but of the manner in which the plaintiffs doctrine and views were sought to be forced upon the defendants, causing a spontaneous uprising against them, they could not recover damages but the remedy would be in the local courts in the community in which the disturbance arose. This instruction was not excepted to, but appellants complain of it as fundamentally prejudicial.

The meaning of this instruction is not entirely clear. Of course, if the disturbance was not the result of an actionable conspiracy the plaintiffs could not recover. There is no evidence to indicate or from which it could be inferred that the disturbance at the auditorium was directly caused by the manner "in which the doctrines and views of the plaintiffs were

sought to be forced upon the defendants." There was evidence that on Friday and Saturday the witnesses went into the homes and places of business in Duncan, distributing their literature and preaching their doctrines. And, there is evidence that this conduct on the part of the appellants aroused the community to action. But, nothing occurred at the auditorium on the part of the appellants to cause a spontaneous uprising against them. We think the instruction, while not fatally prejudicial, was not indicated by the facts and should not have been given.

Appellants also complain of the refusal of the trial court to allow them to make offers for the record of excluded testimony. Rule 43(c), 28 U.S.C.A., provides that "in an action tried by a jury, if an objection to a question propounded to a witness is sustained by the court, the examining attorney may make a specific offer of what he expects to prove by the answer of witness. The court may require the offer to be made out of the hearing of the jury. * * *".

The obvious purpose of this rule is to permit "the examining attorney to make such record that an appellate court can determine whether there was reversible error in excluding the question." Moore's Federal Practice, Vol. 3, p. 3076. If the significance of the excluded evidence is not obvious, the offer of proof must be made to preserve the question on appeal. Hoffman v. Palmer, 2 Cir., 129 F.2d 976; Patton v. Lewis, 10 Cir., 146 F.2d 544. Not having a record of the proffered testimony we cannot judge its competence. From the questions propounded, however, we are able to say that much of the testimony sought to be elicited was clearly incompetent to prove any of the issues on trial. The requirements of the rule are but a codification of prior and accepted practice.

There may be such flagrant abuse of privileges of the rule as to justify curtailment of the proffers in the interest of the administration of justice. But, lest our acquiescence be construed as giving consent to defiance of the Rule, we suggest that the spirit of its mandate cannot be ignored.

Reversible error is assigned in the admission and exclusion of other testimony, and the alleged inflammatory and prejudicial argument by counsel for appellees. The trial was long and vexatious, and marked by frequent encounters between the court and appellants' counsel. The contentious attitude of counsel was not calculated to make the role of the trial judge any less arduous, and the remarks of the court in ruling upon the evidence reflects its impatience with counsel's irritating persistence.

Since in our view of the case the judgment must be reversed, we deem it unnecessary and inappropriate to consider the admissibility of each and every bit of evidence admitted or refused. It seems sufficient to say that some of that which was refused was clearly admissible and some of which was admitted, was clearly irrelevant to the issues and prejudicial. Much of the testimony about which complaint is made is of no probative significance when taken out of the argumentative context in which it was sought to be developed.

Appellees' counsel did engage in flights of oratory beyond the bounds of the evidence, clearly calculated to inflame the jury against an unpopular minority sect.

It is not too much, we think, to indulge in the expectation that the case will be retried in an atmosphere more conducive to the proper administration of justice.

The judgment is reversed and remanded with directions to proceed according to the views herein expressed.