**Robert P. KLING, M.D., Appellant,**

v.

**Henry PETERS, Appellee.**

**No. 88–49.**

District of Columbia Court of Appeals.

Argued June 27, 1989.
Decided Sept. 19, 1989.

---

Steven A. Hamilton, with whom Michael W. Fucheck, Washington, D.C., was on the brief, for appellant.

Larry Gordon, with whom Grandison E. Hill was on the brief, for appellee. William R. Hyde, Jr., Washington, D.C., also entered an appearance for appellee.

Before TERRY and SCHWELB, Associate Judges, and GALLAGHER, Senior Judge.

TERRY, Associate Judge:

Dr. Robert Kling, an ophthalmologist and ophthalmic surgeon, performed a cataract operation on Henry Peters' right eye. Subsequent medical problems affecting the eye led to three more operations, one by Dr. Kling and two by a different surgeon. All these efforts proved unavailing, however, and Mr. Peters lost all vision in his right eye.

Mr. Peters then brought this medical malpractice action, alleging that Dr. Kling was negligent in failing to make use of certain instruments and tests to diagnose post-operative inflammation in the eye, and in failing to refer his patient to a retinal specialist in a timely manner. At trial Peters sought to prove that these alleged breaches of the standard of care directly and proximately caused the loss of sight in his right eye.[1] At the close of all the evidence, the court denied Dr. Kling's motion for a directed verdict and submitted the case to a jury, which returned a verdict for Mr. Peters. The court subsequently denied Dr. Kling's post-trial motions for judgment notwithstanding the verdict and for a new trial. The denial of the new trial motion, however, was contingent on Peters' acceptance of a remittitur. The remittitur was accepted, and this appeal followed.

On appeal, Dr. Kling contends that the trial court erred in admitting the testimony of Mr. Peters' expert witness, Dr. David Smith. He also argues that, even if all of Dr. Smith's testimony was properly admitted, the evidence was nevertheless insufficient to prove either a breach of the standard of care or proximate causation under Peters' two theories of liability, viz., failure to diagnose and failure to refer. Finally,

---

**1.** Greater Southeast Community Hospital was also named in the complaint as a co-defendant, but was dismissed from the case under a pre-trial settlement.

Dr. Kling claims substantial prejudice from a volunteered statement about suicide which Mr. Peters made on the witness stand. We hold that the evidence was insufficient to prove that Dr. Kling breached the standard of care with respect to his failure to use certain diagnostic tools and, further, that the evidence was insufficient to establish that the alleged failure to refer caused Peters' injury. Accordingly, we reverse the judgment of the trial court and remand the case with instructions to enter judgment for Dr. Kling.

## I

According to the trial evidence, Henry Peters, a licensed pharmacist, became a patient of Dr. Kling sometime in 1971 when he visited the doctor for a routine eye examination. About ten years later Dr. Kling noticed a cataract, i.e., a clouding of the lens, forming in Peters' right eye. In late 1983, Mr. Peters, who was then sixty-seven years old, became concerned about his inability to drive a car due to his failing vision. Dr. Kling suggested surgery to remove the cataract.

Dr. Kling chose an extracapsular, rather than an intracapsular, surgical procedure. In intracapsular surgery the cornea is frozen, and both the lens and the posterior wall of the cornea are taken out. When the posterior wall is removed, the vitreous (or vitreous humor), a gelatinous material in the back of the eye, flows forward to fill in the cavity formed by the removal of the lens. During an extracapsular procedure, on the other hand, only the hardened lens material, called the nucleus, and the surrounding fluffy white material, called the cortex, are removed; the posterior wall is left intact to serve as a barrier between the front of the eye and the vitreous. Dr. Kling knew that intracapsular removal would be better "from an immunological point of view" because the lens capsule and its contents would be removed together, so that no lens protein would be spilled out into the interior of the eye, where it might cause an inflammatory reaction. Nevertheless, in this case he recommended the extracapsular procedure because Mr. Peters was both nearsighted and astigmatic, two conditions which Dr. Kling believed would make the extracapsular method safer "from a surgical-mechanical point of view."

The initial operation was performed on January 16, 1984, at Greater Southeast Community Hospital. When Dr. Kling attempted to remove the front capsule, it did not come out in one solid piece, as would normally be expected, but instead broke into several fragments. Kling was thus compelled to use an instrument that would break up the particles, suck them out, and replace the evacuated material. The equipment provided by the hospital could not do all three things simultaneously, however, so Dr. Kling was forced to perform each function separately. This complication lengthened the duration of the surgery and prompted Dr. Kling to close the incision even though he knew that some cortical material, and perhaps some nuclear material, still remained in the eye. He applied a double dose of anti-inflammatory medication because he knew that the retained material enhanced the possibility of inflammation.

When Mr. Peters came for his first postoperative office visit on January 25, nine days later, Dr. Kling noted good absorption of the retained cortical material. On February 8 Dr. Kling again observed that material was being absorbed and that there was no scar formation. The next day, however, he noticed a flare, a small amount of albumin in the front chamber of the eye, which he treated with an anti-inflammatory medicine. A week later, on February 16, Mr. Peters told Dr. Kling that his eye felt better and that he could distinguish the color red. No cells or flares were detected on February 23 when Peters returned for another visit.[2] Nevertheless, Dr. Kling thought the retained material was being absorbed too slowly, so he performed a second operation on March 2 to remove the

---

**2.** According to Dr. George E. Merek, Jr., a witness for Dr. Kling, the number of cells indicates the degree of inflammation. According to Dr.

David J. Smith, Mr. Peters' expert witness, the larger the number of cells, the worse the inflammation, with 4–plus cells being the worst.

excess cortical material from the eye. When Dr. Kling viewed the eye three days later with the aid of a slit lamp and a pantoscope, he saw that the posterior capsule was still intact, as it should have been.

On March 12 Dr. Kling detected no cortical or nuclear material in the vitreous, although it appeared slightly turbid. When Mr. Peters visited the doctors' office on March 21, Dr. Kling placed a Mira lens on the eye and proceeded to examine it with a slit lamp. At that time Dr. Kling observed 2-plus cells in the vitreous. Because the retina was clear, Dr. Kling concluded that there was some inflammation, but no retained nuclear material.

On March 27 Mr. Peters visited another ophthalmologist, Dr. F.J. Sauerburger, who reported to Dr. Kling that he examined the eye with an indirect and a direct ophthalmoscope. Dr. Kling examined the eye himself the next day, March 28, and found no change in its condition. This determination was based on both Dr. Sauerburger's report and Dr. Kling's own examination of the eye with the aid of a visual acuity projector, a trial frame and lenses, and a retinoscope. On that date Dr. Kling recorded vision of 20/80 in Peters' right eye.

On April 4 Dr. Kling discovered flaring and 3-plus cells in the very front part of the vitreous, but he felt there was no cause for alarm because he knew it could take months for cells to clear. During that visit he also measured Mr. Peters' eye for a contact lens. Dr. Kling noted more cells in the anterior chamber on April 16, but on April 19, when he saw Peters again, the doctor concluded that the condition was slowly improving. On April 25 Dr. Kling fitted Mr. Peters with a trial contact lens.

On May 3, discovering that the vitreous was completely clouded, Dr. Kling immediately referred Mr. Peters to a retinologist, Dr. Joseph Timmes.[3] After examining Mr. Peters' eye and performing an ultrasound examination, Dr. Timmes concluded that surgery was necessary because of the onset of severe uveitis and shallow retinal detachment. Dr. Timmes performed a vi-

trectomy and lensectomy the next day, May 4, at Fairfax Hospital. The purpose of this surgery was twofold: first, to remove the vitreous gel so as to allow the retina to be flattened against the interior shell of the eye, and second, to remove whatever lens material might still be present in the eye. After the surgery the inflammation continued, although Mr. Peters' vision "improved significantly," according to a history he gave to Fairfax Hospital intake personnel upon his readmission on May 24 for follow-up surgery.[4] Dr. Timmes' discharge summary following the May 24 surgery noted a break within the retina and a retinal detachment. The evidence established that it was this break and detachment that caused Mr. Peters to lose the vision in his right eye.

Mr. Peters testified that he could see out of his right eye after the January operation, but that from then until mid-February he had continuous pain in his right eye, along with constant tearing. The condition of the eye grew progressively worse, so that by the end of February the only things he could see were the colors green and red. Mr. Peters said not only that he could not see out of his right eye after the second operation, but that the pain and tearing continued throughout March. At one time he saw shooting lights and developed a severe headache above the eye. Dr. Timmes told him after the May 24 surgery that the sight in his right eye was totally gone. From that time on, Mr. Peters testified, he was indeed sightless in his right eye.

Mr. Peters presented only one expert witness, Dr. David J. Smith, a board-certified ophthalmologist and eye surgeon who taught at the Wills Eye Hospital in Philadelphia and maintained a private practice in New Jersey. At the beginning of his testimony Dr. Smith said, "I am not an expert in diseases of the retina. I do not do retinal surgery. But I diagnose many retinal problems and refer them to the appropriate specialists." During the ten-year pe-

---

3. Neither party called Dr. Timmes as a witness at trial.

4. Peters' visual acuity just before the readmission was 20/100.

riod prior to trial, Dr. Smith told the court, he had performed approximately 300 cataract surgeries each year. After hearing this testimony, the court accepted Dr. Smith as an expert in general ophthalmology.

On direct examination Dr. Smith's first conclusion was that Dr. Kling's use of antibiotics and anti-inflammatory drugs to treat the eye in the weeks preceding the March 2 surgery did not violate the standard of care for an ophthalmologist. Moreover, in Dr. Smith's opinion it was proper to perform the March 2 surgery. Dr. Smith testified further that Dr. Kling's use of antibiotics and anti-inflammatory drugs with dilation after the March operation conformed to the standard of care.

Upon reviewing the office notes which Dr. Kling made after the March operation, however, Dr. Smith expressed the opinion that the standard of care for an ophthalmologist, faced with an inflamed and slightly turbid vitreous, complaints of pain in the eye, tearing, and 3–plus cells in the vitreous, required referral to a retinal specialist or a physician specializing in inflammation of the eye. Dr. Smith said that, at the very latest, such a referral should have been made on April 19 when there were complaints of severe pain and no vision, the presence of multiple cells in the vitreous, and the recordation of no intraocular pressure. Beyond that, Dr. Smith stated that the standard of care after the March operation required the use of either an indirect ophthalmoscope along with a Goldman lens, a microscope with a contact lens on the eye, an ultrasound test, or other instrumentation to find out whether any material from the nucleus had been retained in the eye. Dr. Kling's notes, however, were not complete enough for Dr. Smith to determine what instruments he had used to examine Mr. Peters' eye. On cross-examination Dr. Smith conceded that although, in his professional opinion, Dr. Kling should have used an indirect ophthalmoscope with a Goldman lens in April to examine the eye, he could not testify to a reasonable degree of medical certainty that those instruments were not used by Dr. Kling in that period because Dr. Kling's notes were so sketchy.[5]

Dr. Timmes' post-operative notes, as interpreted by Dr. Smith, indicated the presence of retained lens material, both nuclear and cortical, in the eye. Referring to this report, Dr. Smith testified over objection that the blindness in Mr. Peters' right eye was caused by phacoanaphylactic uveitis (inflammation of the uveal tract and vitreous) brought on by retained lens material, which in turn led to retinal deterioration and detachment resulting in loss of sight. Dr. Smith concluded that the posterior capsule must have broken in order for this nuclear material to migrate into the vitreous. Smith was unable to say, however, when or under what conditions the posterior capsule ruptured. Indeed, Dr. Smith admitted that it might have broken during Dr. Timmes' surgery, and not during Dr. Kling's management of the case, although Smith thought this was unlikely.

In sum, Dr. Smith concluded that Dr. Kling did not violate the standard of care for an ophthalmologist when he (1) performed the January 16 surgery, even though some of the nucleus and cortex was left in the eye; (2) performed the March 2 surgery; (3) treated his patient with antibiotics and anti-inflammatory drugs during the period from January 16 to March 2; and (4) continued the same course of treatment after March 2. According to Dr. Smith, the only possible breaches of the standard of care were in not using appropriate instrumentation or tests after the March surgery and in not referring Mr. Peters to a retinologist on or before April 19 when, given the patient's subjective complaints and the objective findings, it would have been "appropriate" for Dr. Kling to consult with another doctor.

5. Dr. Arthur Pilkerton, a defense witness, also testified later in the trial that he could not determine from Dr. Kling's notes whether an indirect ophthalmoscope with a Goldman lens was used to examine the eye between March 4 and April 25. Dr. Kling himself testified, "I don't usually write down every gadget that I use, so I can't tell you that I did or didn't [use a particular instrument] on the basis of the notes."

Dr. Kling presented two expert witnesses who gave their own opinions as to the two alleged breaches of the standard of care. Dr. George E. Merek, Jr., a board-certified ophthalmologist specializing in uveitis, testified that the conservative treatment prescribed by Dr. Kling, up to and including the office visit on April 25, was appropriate and within the standard of care. Dr. Merek's review of Dr. Kling's office notes and Dr. Timmes' post-operative report led him to conclude that Mr. Peters' condition was improving up to April 25, and that only after that date did a sudden clouding of the vitreous occur. Dr. Merek attributed this sudden clouding either to rapid onset of an infection or to an allergic reaction in the vitreous to the retained lens material, a very rare occurrence known as phacoanaphylactic endophthalmitis.

The defense's second expert witness, Dr. Arthur R. Pilkerton, a board-certified ophthalmologist who specialized in retinal diseases and retinal surgery, testified "within a reasonable degree of medical certainty" that Dr. Kling did not violate the standard of care in failing to consult with a retinologist on or before April 25 because there was nothing a retinologist could have done that Dr. Kling was not already doing. Dr. Pilkerton concluded that a rapid onset of phacoanaphylaxis (severe inflammation) occurred after the April 25 office visit. In Dr. Pilkerton's opinion, the outcome (blindness) would have been no different had retinal surgery been performed on April 19 rather than May 4. This was so, Pilkerton said, because it was a retinal break, which occurred on or about May 23, that sealed the fate of Mr. Peters' right eye. Significantly, Dr. Pilkerton testified that the retinal break was not related to a shallow retinal detachment which Dr. Timmes discovered and treated, with apparent success, during the May 4 surgery. See note 13, *infra.*

At the close of the plaintiff's case, Dr. Kling's counsel moved for a directed verdict. He argued that Mr. Peters had not proved a breach of the standard of care with respect to the way Dr. Kling treated the eye after the January 16 operation, nor had he proved that Dr. Kling's management of the case proximately caused the blindness in the eye. Counsel also asserted that Mr. Peters' pretrial statement did not indicate that Dr. Smith would testify on causation.[6] The trial judge denied the motion because, as she recalled the evidence, Dr. Smith had testified to a violation of the standard of care as of April 19 due to an alleged failure to refer Mr. Peters to a retinologist and to a violation of the standard of care after the March 2 surgery in not using proper instrumentation to detect retained lens material in the eye. The motion was renewed at the close of the defense case and was again denied. In renewing the motion, counsel for Dr. Kling argued that there was no evidence that the failure to use certain instruments from March 2 through April 19 proximately caused Peters' blindness. He also maintained that there was no evidence that the failure to refer Mr. Peters to a specialist on April 19 caused the eventual blindness.

In its instructions to the jury, and with the approval of both counsel, the court narrowed the issues to two: first, whether Dr. Kling "violated the standard of care by failing to refer Mr. Peters to an eye specialist as of April 19, 1984," and second, whether Dr. Kling "violated the standard of care from March 5, 1984, to May 3, 1984, by failing to use those instruments and diagnostic tests necessary to determine the cause of Mr. Peters' eye problem," thereby failing to detect retained lens material.

The case went to the jury on a Friday. Later that same day, using a verdict form, the jury found that Dr. Kling was negligent in failing to refer Mr. Peters to an eye specialist as of April 19, 1984, and that

---

**6.** Counsel contended in addition that the pre-trial statement mentioned nothing about a breach of the standard of care with respect to the completeness of Dr. Kling's operative notes, and that no proof had been offered to show that the standard of care had been breached in the preparation of either those notes or the post-operative office notes. We do not address these contentions because Mr. Peters chose not to press the issue of the notes at trial, and this issue was not submitted to the jury.

such negligence proximately caused his injury. In the "Damages" section of this verdict form the jury awarded Mr. Peters $573,233.00. When the proceedings reconvened the following Monday, the jurors were given a second verdict form which asked if they also found that appellant was negligent in failing to use those instruments and diagnostic tests necessary to detect, recognize, and diagnose retained nuclear material in Mr. Peters' eye. After further deliberations, the jury found that Dr. Kling had breached the standard of care in this regard also and that this breach had proximately caused the loss of sight. However, because the "Damages" section of the second verdict form was crossed out, the jury did not state the amount of damages which flowed from this violation of the standard of care.

Dr. Kling filed a post-trial motion for judgment notwithstanding the verdict or, in the alternative, for a new trial or a remittitur. The court denied the motion for judgment n.o.v., but granted the motion for a remittitur in the amount of $154,500.00, reducing the damage award to $418,733.00. If Mr. Peters elected not to accept the remittitur, the court said, it would order a new trial. Peters did accept the remittitur, however, and the court thereafter entered a final judgment.

## II

■ Dr. Kling contends that the court should not have allowed Dr. Smith to say anything to the jury about causation because Mr. Peters' pre-trial statement, *see* Super.Ct.Civ.R. 26(b)(4)(A), did not specifically mention causation as one of the issues *to be addressed by Dr. Smith in his testimony.* In his Rule 26(b)(4) statement, Mr. Peters notified the court that he proposed to offer at trial the testimony of Dr. Smith, which he said "will focus upon the failure of the defendant, Robert P. Kling, M.D., to render appropriate and adequate medical care and treatment." The statement did not specifically include a reference to "causation," although the quoted passage arguably leaves room for testimony on causation because it says that Dr. Smith will "focus" on the standard of care; it does not say that he will limit himself to testimony on the standard of care. But even assuming that appellee's Rule 26(b)(4) statement was defective in this respect, we find no basis for reversal.

In a recent decision, this court, after reviewing pertinent case law in the District of Columbia and elsewhere, listed five factors which a court should weigh when deciding whether to allow expert testimony that was omitted from a pre-trial statement:

(1) whether allowing the evidence would incurably surprise or prejudice the opposite party;

(2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;

(3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully;

(4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and

(5) the impact of excluding the proposed testimony on the completeness of information before the court or jury.

*Weiner v. Kneller,* 557 A.2d 1306, 1311–1312 (D.C.1989). Reviewing the record with these factors in mind, we conclude that the trial court properly admitted Dr. Smith's testimony on causation.

The record belies appellant's assertion that he was surprised by Dr. Smith's testimony on causation. In a deposition taken on March 5, 1987, Dr. Kling's counsel (who was also trial counsel) asked Dr. Smith the following question:

Doctor, would it be a fair statement to say that given Mr. Peters' age, the underlying eye condition, the type of surgical procedure performed, and even what you would glean from the records, that even if he had been referred—and I'm assuming that there was continuous inflammation from the date of the retinal surgery to the date of referral—even if Mr. Peters had been referred to Dr. Timmes say within a week after the original retinal surgery, you could not render

an opinion within any reasonable degree of medical certainty that the outcome would have been any different than it is now; isn't that a fair statement?

This question, which clearly calls for Dr. Smith's conclusion as to proximate cause, was answered as follows:

No. I think with earlier removal of the antigenic substance, which was retained nuclear material, that the chance of salvaging the eye are [sic] greatly increased.

\* \* \* \* \* \*

The longer the antigenic substance is inside the eye, that is, the retained nucleus, the more inflammatory response, and the more complications develop inside the eye due to that antigenic substance. So earlier removal of that antigenic substance, that is, the retained nucleus, would, I think in all medical probability, reduce the risk of more severe complications developing.

Thus the question asked of Dr. Smith at the deposition by Dr. Kling's counsel was essentially the same question that Dr. Kling's counsel now says came as a complete surprise at trial when asked by opposing counsel. Moreover, at another point in the deposition, Dr. Smith described the standard of care required of an ophthalmologist under the circumstances and then said, "I think if that [referral] had been done earlier, that this eye probably would have been salvaged." On this record we can say with fair assurance that Dr. Smith's trial testimony on causation came as no surprise.

Excluding this testimony would have incurably prejudiced Mr. Peters because without it the evidence would certainly have been insufficient to support the negligence claims. *See Daniels v. Beeks*, 532 A.2d 125, 129 (D.C.1987) (abuse of discretion for trial court to deny appellants' request to amend their pre-trial statement when medical expert's testimony "might well have tipped the balance in favor of appellants"); *Adkins v. Morton*, 494 A.2d 652, 658–659 (D.C.1985) (defendant physician was seriously prejudiced when a witness, who was not specifically listed on a Rule 26(b) statement, was precluded from testifying on a matter going to damages; judgment reversed and case remanded for new trial on damages). Furthermore, since Dr. Smith's testimony on causation came after lengthy testimony on the history of Mr. Peters' condition, it could be seen as an attempt to complete the information needed by the jury in reaching its verdict. There being no claim on appeal that the omission of the words "causation" or "proximate cause" in the Rule 26(b)(4) statement was made willfully and with the intent to deceive, we affirm the trial court's decision to allow Dr. Smith to render an opinion on causation. *Weiner v. Kneller, supra,* 557 A.2d at 1312; *see Corley v. BP Oil Corp.,* 402 A.2d 1258, 1262 (D.C.1979) (rigid adherence to a pre-trial order is not necessary).

### III

At the outset of his testimony, Dr. Smith said that because he did not perform retinal surgery, he would limit his opinions to those matters with which he was familiar as a cataract surgeon and ophthalmologist. Later, when he was asked to render an opinion as to whether Dr. Kling's failure to refer Mr. Peters to a retinologist on or about April 19 was the proximate cause of his injury, the court did not permit Dr. Smith to answer the question on the ground that this was a matter on which only a retinologist could testify. Nevertheless, the court allowed Smith to give an opinion about whether Dr. Kling's failure either to diagnose or to detect retained lens material after the March 2 surgery proximately caused the severe inflammation which allegedly led to the detached retina. The court said, "Certainly an ophthalmologist has to know something about the detachment of a retina." Dr. Kling now maintains that any opinion rendered by Dr. Smith on causation was inadmissible because he was an ophthalmologist and, as such, could not render an opinion on the causes of retinal damage.

Dr. Kling's argument on appeal presents the same problem that vexed the trial judge throughout the trial, namely, "too much focus on a specialty and too little

focus upon the breach alleged." *Ornoff v. Kuhn & Kogan, Chartered,* 549 A.2d 728, 731 (D.C.1988). The complaint alleged that Dr. Kling was negligent in failing to use the proper instruments to diagnose retained nuclear material in his patient's eye after the March surgery. Dr. Kling was an ophthalmologist. Dr. Smith was an ophthalmologist. An ophthalmologist is "a physician who *specializes* in the diagnosis and medical and surgical treatment of diseases and defects of *the eye and related structures.*" DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 929 (26th ed. 1981) (emphasis added). The retina is part of the eye. Hence Dr. Smith was qualified to testify about what Dr. Kling, as an ophthalmologist, should have done after the March surgery. To assert as appellant does that only a practitioner in the sub-specialty of retinology could testify on diseases affecting the retina is, as the trial court aptly put it, "splitting hairs." We hold that the trial court reasoned and ruled correctly in permitting Dr. Smith to testify as he did. *Ornoff, supra,* 549 A.2d at 731–732 (hematologist who was board-certified in internal medicine was competent to render an opinion on pre-surgical testing and treatment); *Rotan v. Egan,* 537 A.2d 563, 570 (D.C. 1988) (one medical doctor could testify on infectious diseases when he had been an instructor in the field, and another doctor, who was an internist, could testify on what was required of obstetricians and gynecologists); *see Baerman v. Reisinger,* 124 U.S. App.D.C. 180, 181, 363 F.2d 309, 310 (1966) ("The training and specialization of the [expert] witness goes to the weight rather than the admissibility of the evidence, generally speaking").

IV

"In a medical malpractice case the plaintiff must prove, generally through expert testimony, that there was an applicable standard of care, that the defendant breached that standard, and that the breach was a proximate cause of the plaintiff's injuries." *Psychiatric Institute of Washington v. Allen,* 509 A.2d 619, 623–624 (D.C.1986) (citations omitted). Because the trial court did not permit Dr. Smith to testify whether, in his opinion, a failure to make a timely referral to a retinologist proximately caused the blindness in Mr. Peters' right eye,[7] and because we can find in the record no other evidence of proximate cause relevant to Mr. Peters' failure-to-refer claim, we hold that the trial court erred in submitting this claim to the jury. We further hold that Mr. Peters failed to prove either that Dr. Kling, in the period after the March 2 surgery and continuing through April 19, breached the standard of care by failing to use certain instruments to diagnose an inflammation in the eye, or, with respect to the ultrasound examination, that Dr. Kling's failure to conduct such an examination was a proximate cause of the injury of which Peters complained.[8]

Dr. Smith testified that, in light of Mr. Peters' symptoms after the March 2 surgery, the relevant standard of care required the use of an indirect ophthalmoscope with a Goldman lens, a microscope (or slit lamp) with a contact lens on the patient's eye, or, if the eye was very inflamed, an ultrasound examination to detect retained nuclear material.[9] Dr. Kling's office notes mentioned that he used a slit lamp to examine the eye, but the notes did not state whether a contact lens was placed on the eye at the same time the

---

**7.** Arguably, this ruling was incorrect, since Dr. Smith had already testified that, as an ophthalmologist, he diagnosed retinal diseases and referred patients to specialists when appropriate. However, because Mr. Peters has not filed a cross-appeal, we need not and do not decide whether it was reversible error.

**8.** In the absence of complicated medical questions, a plaintiff's own testimony can establish causation without the need for expert witnesses. *International Security Corp. v. McQueen,* 497

A.2d 1076, 1080 (D.C.1985). In this case, however, because of the complex structure of the eye and the difficulty of determining the etiology of eye disorders, Mr. Peters' testimony standing alone could not have established causation. It was crucial to Peters' case that his expert witness, Dr. Smith, testify as to causation under both theories of negligence.

**9.** Dr. Smith agreed that there was no breach of the standard of care before the March 2 surgery.

lamp was used. The notes also said that the retina was examined, but they did not say whether by a direct or indirect ophthalmoscope.[10] Consequently, when asked on cross-examination to state his opinion about whether Dr. Kling breached the standard of care by not using an indirect ophthalmoscope or a slit lamp with a Goldman lens, Dr. Smith admitted, "As far as not using those instruments, *I cannot render an opinion*, that's correct" (emphasis added). There being no other evidence of a breach, we hold that Mr. Peters did not make a *prima facie* showing that Dr. Kling breached the applicable standard of care by failing to use proper instrumentation to detect retained lens material. *Cf. Gordon v. Neviaser*, 478 A.2d 292, 296 (D.C.1984) (evidence insufficient to establish *prima facie* case when pre-operative documentation of the patient's condition was "sketchy").

■ Mr. Peters points out, however, that Dr. Kling did not conduct an ultrasound examination either,[11] and that, according to Dr. Smith, not ordering an ultrasound examination when the eye is severely inflamed would be a violation of the standard of care.[12] Further, Dr. Smith was of the opinion that the eye was severely inflamed at least as early as March 21. Taking note of this testimony, and viewing the evidence in the light most favorable to appellee, *see Washington Healthcare Corp. v. Barrow*, 531 A.2d 226, 228–229 (D.C.1987), we nevertheless conclude that the evidence did not establish that failure to order an ultrasound examination was a proximate cause of the injury.

When, on direct examination, Dr. Smith was squarely asked, "What in your opinion was the cause of Mr. Peters' blindness in his right eye?", he replied:

My opinion is that he suffered phacoanaphylactic uveitis, which is inflammation of the uveal tract and the vitreous due to retained lens material, which led to a violent inflammation of the vitreous, which led to a retinal deterioration and retinal detachment, which resulted in blindness.

First of all, Dr. Smith never said that if a diagnosis of uveitis had been made sooner than it was, a vitrectomy would have been performed sooner than it was, *i.e.*, before May 4. Thus there is no evidence that anything would have happened differently even if an ultrasound examination had been performed earlier and a diagnosis of uveitis made earlier. On the other hand, Dr. Smith did testify that even though an ultrasound examination was performed shortly before the May 4 surgery, Dr. Timmes' notes did not indicate that the ultrasound revealed either a retinal detachment or the presence of retained nuclear material. The detachment and the retinal break which led to Mr. Peters' blindness did not occur, according to the evidence, until sometime after the May 4 surgery,[13] so that it would

---

**10.** The evidence did show that on March 27 Dr. Sauerburger used an indirect ophthalmoscope to examine the eye, according to a report sent by Dr. Sauerburger to Dr. Kling before Kling examined the eye on March 28.

**11.** Dr. Kling admitted this during his testimony.

**12.** Appellant asserts that Dr. Smith said the failure to conduct an ultrasound examination did not breach the standard of care. This is not correct. Dr. Smith said that if Dr. Kling was personally not proficient in doing an ultrasound examination, he should have referred Mr. Peters to someone who was.

**13.** Reviewing Dr. Timmes' notes, Dr. Pilkerton testified that Dr. Timmes found the posterior capsule "intact" during the May 4 surgery. On that occasion Dr. Timmes did find a "shallow retinal detachment," but without any break in the retina. According to Pilkerton, Timmes "looked very hard to see if there was a break, and he could not find one. That is why we assume that there was no break because you can see these things very, very clearly during the surgery." Dr. Timmes' post-operative examination "showed that the retina was re-attached and the situation was doing well." The break in the retina was first discovered some time later, leading to Dr. Timmes' decision to perform another operation on May 24 to repair the break. During the latter surgery, incidentally, Dr. Timmes' notes reflected "no problem" with regard to the previously detected shallow retinal detachment.

Dr. Smith's testimony did not address this portion of Dr. Timmes' notes, other than to remark that the post-operative notes following the May 4 surgery mentioned the same retinal detachment to which Dr. Pilkerton referred. Smith did not state what Timmes did about this detachment, however, because his testimony

have made no difference to the outcome if an ultrasound examination had been or-, dered by Dr. Kling on or before April 19.

We therefore hold that Mr. Peters (1) did not present sufficient evidence to prove that his loss of sight was proximately caused by Dr. Kling's failure on or before April 19 to refer him to a retinologist or to order an ultrasound examination, and (2) did not present sufficient evidence to prove that Dr. Kling breached the standard of care by failing to use certain instruments. *See Sponaugle v. Pre–Term, Inc.*, 411 A.2d 366, 369–370 (D.C.1980). Even when the evidence is viewed in the light most favorable to Mr. Peters, no reasonable trier of fact could reach a verdict in his favor. *See Washington Metropolitan Area Transit Authority v. Jones*, 443 A.2d 45, 49 (D.C. 1982) (en banc); *Rich v. District of Columbia*, 410 A.2d 528, 532 (D.C.1979) (directed verdict or judgment n.o.v. for defendant is proper when "negligence ... and proximate cause will not be questions of fact for the jury" (citations omitted)).

## V

Even though we reverse for insufficiency of the evidence, there was one procedural error which we find so troubling that we feel obliged to address it before concluding this opinion.

■ Mr. Peters was the first witness to testify at trial. Near the conclusion of his direct examination, he was asked, "Do you have any major fears now that you did not have before?" "I live in constant fear," he replied. "I am always afraid [that] I may lose this other eye, and I cannot live as a blind person. If something should happen to this other eye, the only thing I can do is take my life." Counsel for Dr. Kling immediately objected to this suggestion of suicide, claiming that it was highly prejudicial, and also moved for a mistrial. The court denied the motion on the ground that the remark was made early in the trial, and the jurors were seemingly mature enough to "understand emotional outbursts." Con-

sistently with this ruling, the court neither struck the remark nor gave a cautionary instruction.

How to handle such incidents is a matter within the trial court's broad discretion. We see no abuse of that discretion here. The vast majority of courts considering the issue have held that a mistrial is rarely warranted after an emotional outburst by a plaintiff, even when the outburst is more emotion-laden than Mr. Peters' conjectural statement that he would probably take his life if he ever became totally blind. These courts have reasoned that the trial judge, who heard and saw the outburst and the jury's response, was in the best position to assess what prejudice, if any, the defendant might have suffered as a result of what happened. *E.g., Southern Ry. v. Lawson*, 256 Ga. 798, 802–803, 353 S.E.2d 491, 495–496 (1987) (no abuse of discretion in denial of motion for mistrial after plaintiff in a wrongful death action "sobbed constantly and made direct emotional speeches to the jury" during his testimony); *Costello v. Chicago Transit Authority*, 40 Ill.App.3d 461, 469, 352 N.E.2d 417, 424 (1976) (affirming denial of mistrial after 71–year–old blind plaintiff broke down and cried twice during her testimony); *Luquette v. Bouillion*, 184 So.2d 766, 770 (La.Ct.App.1966) (affirming denial of mistrial after plaintiff allegedly had a "crying fit in the hall of the courthouse"); *Eichelberger v. Barnes Hospital*, 655 S.W.2d 699, 707 (Mo.App.1983) (affirming denial of mistrial after plaintiff's "emotional and tearful" testimony that she was embarrassed to be seen in public with the oxygen apparatus she had to use because of defendant's alleged malpractice); *Aderhold v. Stewart*, 172 Okla. 72, 76, 46 P.2d 340, 345 (1935) (no abuse of discretion in denying mistrial after plaintiff cried and became hysterical during cross-examination, then returned to court the following day "leaning heavily on the arms of her relatives and friends"); *see also Hallman v. United States*, 410 A.2d 215, 217 (D.C.1979) (trial

was focused (through counsel's questions) primarily on Dr. Timmes' removal of the retained lens material. Smith said nothing at all about

the break in the retina which Dr. Timmes discovered on May 24.

court acted within its discretion in deciding that a "screaming and shrieking" spectator at a criminal trial would not cause the jury to render a guilty verdict out of sympathy). Moreover, final instructions to the jury usually mitigate the prejudicial effect of the kind of statement that Mr. Peters made here. *See, e.g., Christian v. United States*, 394 A.2d 1, 23 (D.C.1978) (emotional outburst of murder victims' father), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *Evans v. United States*, 392 A.2d 1015, 1025–1026 (D.C. 1978) (emotional outburst by co-defendant).

■ The error which prompts this discussion lies in the timing of the trial court's instructions to the jury. The court did tell the jury to determine the facts without prejudice, fear, or favor, and to "weigh and consider the case without sympathy, prejudice, or passion." But the mitigating effect of these instructions was diluted because they were given before the closing arguments,[14] contrary to the plain and explicit language of Super.Ct.Civ.R. 51. That rule states that "the Court *shall* instruct the jury *after* the arguments [of counsel] are completed" (emphasis added). "The requirements of Rule 51 are too plain for misunderstanding." *Downie v. Powers*,

193 F.2d 760, 766 (10th Cir.1951).[15] Because the closing arguments in this case came after the instructions, it is doubtful that the instructions had any remedial effect on Mr. Peters' comment about suicide, especially since the very last words heard by the jury before they began deliberating were those of Peters' counsel, who ended his rebuttal argument by saying that Dr. Kling's alleged negligence had sent his client "down a tunnel of darkness that he will never come out of until he sees his Lord." The reference in this statement to blindness and death harks back ominously to Mr. Peters' comment that if he were to become totally blind, "the only thing I can do is take my life." [16]

We need not decide whether this violation of Rule 51, standing alone, would warrant reversal, since we are reversing the judgment on other grounds. Nevertheless, this case well illustrates why it is essential to adhere to the strictures of Rule 51. The authors of the rule, by requiring the jury instructions to come last, ensured that jurors would begin their deliberations immediately after hearing the impartial instructions of the judge, rather than the emotional entreaties of an advocate.[17] Needless to

**14.** According to the transcript, immediately after charging the jury, the court addressed Mr. Peters' counsel and said, "All right, Mr. Hill." Counsel then began his closing argument. Counsel for Dr. Kling then gave his summation, followed by rebuttal argument from Mr. Peters' counsel. When we asked at oral argument whether the transcript was correct, both appellate counsel stated that their recollection was that the instructions preceded the closing arguments.

**15.** *Downie v. Powers, supra*, involves Fed.R. Civ.P. 51, which, until August 1, 1987, was identical to Super.Ct.Civ.R. 51. The federal rule was amended, effective August 1, 1987, to allow a court, "at its election, [to] instruct the jury before or after arguments to the jury." The Superior Court rule has not been so amended.

We nevertheless cite *Downie* here because, as we have often held, decisions of federal courts construing or applying a federal rule are persuasive authority for us in deciding cases involving an identical local rule. *See, e.g., Matthews v. Automated Business Systems & Services, Inc.*, 558 A.2d 1175, 1179 n. 5 (D.C.1989) (citing cases).

**16.** The amount of the remittitur ordered by the trial court suggests to us that the court itself was

troubled by the size of the verdict in light of the evidence. *See Louison v. Crockett*, 546 A.2d 400, 403 (D.C.1988) (citing cases); *Phillips v. District of Columbia*, 458 A.2d 722, 724–725 (D.C.1983); *see also Stephans v. Chicago Transit Authority*, 28 Ill.App.2d 229, ——, 171 N.E.2d 229, 231 (1960).

**17.** With respect to the pre–1987 version of Fed. R.Civ.P. 51, one commentator has written:

> This seems a salutary rule and requires little explanation. Many lawyers object to the requirement that objections to instructions must be made before the jury retires, but this practice gives the judge an opportunity to make any desired corrections which he thinks are proper. Then, too, many lawyers wished to have their arguments after the instructions had been given (so that they might discuss the case in the light of the instructions); but it seemed wiser to the committee that the last words heard by the jurors should be the impartial charge of the judge rather than the impassioned pleas of the counsel.

Dobie, *The Federal Rules of Civil Procedure*, 25 Va.L.Rev. 261, 290 (1939) (footnote omitted).

say, it is a simple matter to avoid such problems as this case presents by always concluding a jury trial with the court's instructions, as Rule 51 commands.

Having noted this procedural flaw, we reiterate our holding that Mr. Peters failed to present sufficient evidence to support a finding that Dr. Kling was liable under either of his two theories of negligence. Accordingly, we reverse the judgment and remand this case to the trial court with directions to enter judgment for Dr. Kling.

*Reversed and remanded.*