Lewis R. TOWNSEND,
et al., Appellants,

v.

Kimberly DONALDSON, Appellee.

No. 04–CV–439.

District of Columbia Court of Appeals.

Argued Dec. 9, 2005.
Decided April 26, 2007.

Lee T. Ellis, Jr., with whom Johnine P. Barnes was on the brief, Washington, DC, for appellant.

Robert R. Michael, for appellee.

Before REID and KRAMER, Associate Judges, and LONG,* Associate Judge, Superior Court of the District of Columbia.

KRAMER, Associate Judge:

The appellee, Kimberly Donaldson, asserted medical malpractice claims against the appellant, Dr. Lewis Townsend,[1] and Sibley Memorial Hospital ("the Hospital")[2] following complications from a surgical procedure that led to subsequent surgeries

---

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

1. Dr. Townsend and his professional corporation were both named in the lawsuit. For simplicity, we refer to both as "Dr. Townsend."

2. The Hospital settled its claims with Ms. Donaldson shortly after Dr. Townsend filed his initial brief on appeal.

and permanent injuries. After a twelve-day trial, a jury found Dr. Townsend and the Hospital liable and returned a verdict in favor of Ms. Donaldson in excess of three million dollars. Only Dr. Townsend has appealed, the Hospital having settled with Ms. Donaldson. On appeal, Dr. Townsend asserts that there were numerous errors committed during the course of the trial, including the use of an insufficient verdict form, improper admission of expert testimony, unfair surprise and an erroneous ruling on his motion for judgment notwithstanding the verdict. We affirm.

## I. Factual Background

On January 8, 2000, Ms. Donaldson was admitted to the Hospital for a surgical procedure called a dilation and curettage ("D & C") to be performed by Dr. Townsend.[3] During the procedure, Dr. Townsend inadvertently perforated Ms. Donaldson's uterus. In doing so, he seized a piece of yellow tissue that he identified as fat. Testimony at trial indicated that yellow tissue is not normally found in the uterus, and that the tissue likely came from the omentum[4] or the bowel, which is located behind the uterus. Dr. Townsend directed the nurse not to send the specimen to the pathology department for analysis.[5]

After Dr. Townsend completed the D & C, he performed a laparoscopy on Ms. Donaldson to repair the perforation and identify any further injuries.[6] In doing so, Dr. Townsend examined both the small and large bowels, neither of which appeared to him to be injured. Accordingly, Dr. Townsend attempted to repair the perforation in the uterus. To do so, he used a monopolar cautery probe provided by one of the Hospital's nurses, which neither he nor the nurse inspected beforehand. The probe malfunctioned. Dr. Townsend informed the nurses of the failure and then switched to a bipolar cautery with which he cauterized the perforation. He concluded the laparoscopy by again searching for damage to the large bowel, finding none.

Following her discharge from the hospital, which occurred on the same day as the operation, Ms. Donaldson experienced symptoms including nausea, pain, dizziness, abdominal bloating, and a temperature. After taking medication prescribed by Dr. Townsend, which did not alleviate her symptoms, she called his office to report her condition. The next day, January 9th, the conditions had worsened and she called again. She reported feeling "horrible," and that she had shoulder pain, was unable to sleep in a bed or lie flat because of abdominal distention, was unable to eat, was throwing up, and had an elevated temperature. The symptoms continued on January 10th, and she called Dr. Townsend once again.

On Tuesday, January 11th, Ms. Donaldson was taken to Dr. Townsend's office. It was painful for her to walk, and she wore pajama bottoms to the visit because her stomach was too distended to wear her normal clothing. It was also difficult for

---

3. In a D & C, the gynecologist inserts a probe into the uterus to diagnose abnormalities.

4. The omentum is a fold of serous membrane extending from the stomach to adjacent organs in the abdominal cavity.

5. Although Dr. Townsend's failure to send the specimen to pathology may have been a viola-

tion of the Hospital's procedures, that issue is not before us on appeal.

6. In this procedure, a camera is inserted through the abdomen, after which other instruments are inserted through a second incision to treat any identified injuries.

her to lay flat on the doctor's examining table, and she informed Dr. Townsend that she had been sleeping in a chair because of extreme pain and abdominal distention. Dr. Townsend obtained an x-ray that showed "pleural effusions" (liquid in her lungs), which were consistent with an infection. It also showed "free air" in the abdomen that should not have been present and was consistent with a bowel perforation. Dr. Townsend concluded that she was suffering from an ileus, a blockage of the small or large bowel.

The next day, Wednesday, January 12th, her symptoms remained the same, except that her vomit had become green and foul smelling whenever she threw up. Although she reported her symptoms to Dr. Townsend, he did not order a CT scan or MRI, but asked her if she would like to return to the Hospital, an offer that she declined. On Thursday, January 13th, when the symptoms were still the same, she again called Dr. Townsend, who instructed her to come into his office. Following a consultation with his medical partner, Dr. Townsend admitted her to the Hospital to consult with a general surgeon, Dr. Richard DeRosa. Dr. DeRosa ordered no new treatment until Friday, January 14th, when a slight temperature prompted him to place Ms. Donaldson on antibiotics.

On Saturday, January 15th, Dr. DeRosa operated on Ms. Donaldson after her abdomen became more tender and her white blood cell count rose despite the antibiotic treatment. During the surgery, Dr. DeRosa determined that Ms. Donaldson had a perforation in her small bowel that had allowed more than three quarts of toxic bowel content to leak into her peritoneal cavity. He repaired the perforation by removing six inches of her bowel. This leakage meant that her internal organs had been continually bathed in infectious material which led to her various complications, including sepsis, Adult Respiratory Distress Symptoms, pulmonary dysfunction, the need for multiple additional surgeries, scar tissue, swollen and blocked fallopian tubes, and infertility.

On January 18th, after discussing the case with Dr. DeRosa, Dr. Townsend reached the conclusion that an electric spark from the cautery probe that failed during the laparoscopy had burned Ms. Donaldson's bowel, slowly causing her bowel to perforate. He went to the Hospital's equipment room and identified the probe that he believed he had used in the procedure, claiming that it was grayer than the other probes and had a piece of red tape on it. The insulation on the probe was frayed.

Subsequently, Ms. Donaldson filed a medical malpractice case in the Superior Court against Dr. Townsend and the Hospital asserting professional negligence. According to the Pretrial Order, she asserted the following negligent acts as the bases for her claims: (1) Dr. Townsend's failure to submit the yellow tissue to pathology,[7] (2) his failure to tell his associate or a consulting surgeon about the yellow tissue, (3) his failure to properly examine Ms. Donaldson's bowel after he punctured her uterus, (4) his failure to provide proper care following surgery, and (5) Dr. Town-

---

7. Before opening statements, the trial court, while addressing several motions *in limine* filed by Dr. Townsend, ruled that Dr. Townsend's failure to submit the yellow tissue to pathology, while a relevant fact, was not a proximate cause of Ms. Donaldson's injuries and could not be argued as "part of the negligence that caused the injury." [J.A. at 1146]. Since both the removal of the yellow tissue and the inspection of the monopolar probe are no longer at issue on appeal, we need not address Dr. Bechamp's testimony regarding those topics.

send's and the Hospital's failure to inspect the monopolar probe.

While neither defendant asserted cross-claims, it became apparent by the time of trial that they had different theories of the case. Dr. Townsend maintained that the defective probe provided by the Hospital had caused a thermal burn on the small bowel that eventually resulted in a puncture. In contrast, the Hospital asserted that Dr. Townsend had punctured the bowel mechanically during the initial D & C.

At the conclusion of trial, the jury found both Dr. Townsend and the Hospital liable. The basis for liability with respect to the Hospital rested on its failure to inspect and maintain the probe. In response to a series of special interrogatories, the jury found that Dr. Townsend had breached the standard of care by his: (1) failure "to appropriately inspect the bowel on January 8, 2000," (2) failure "to recommend a CT Scan on January 11, 2000, or January 12, 2000," (3) failure "to hospitalize [Ms. Donaldson] earlier than January 13, 2000," and (4) failure "to consult with another physician earlier than January 13, 2000." The jury found that Dr. Townsend had not breached the standard of care when he punctured Ms. Donaldson's uterus or in his inspection of the probe.

Four basic issues are before us on appeal: (1) whether the trial court erred by not requiring the jury to make specific findings of causation regarding the theories of liability listed on the special verdict form; (2) whether the trial court erred in allowing an expert witness for the Hospital, Dr. Bechamp, to testify as to the standard of care where the Hospital's Rule 26(b)(4) statement did not specifically state that he would provide such testimony; (3) whether Ms. Donaldson was entitled to use Dr. Bechamp's expert testimony to make her *prima facie* case that Dr. Townsend

had violated the standard of care and that the violation was the proximate cause of her injuries; and (4) whether the trial court erred in denying Dr. Townsend judgment as a matter of law after the close of all the evidence on the ground that Ms. Donaldson had failed to show sufficient evidence of causation. We begin with the issue of the jury form.

## II. Clarity of the Verdict Form

At the conclusion of trial, Dr. Townsend and Ms. Donaldson both submitted suggested verdict forms, each of which contained a set of special interrogatories. Over Dr. Townsend's objection, the trial court chose the verdict form proposed by Ms. Donaldson. Dr. Townsend argues that it leaves unanswered the question of whether each of the violations of the standard of care found by the jury was a proximate cause of Ms. Donaldson's injuries. A description of the jury form is necessary to an understanding of this argument.

The three-page form began with a "General Verdict" section. This section, in relevant part, asked the jury whether Dr. Townsend breached the standard of care in his treatment of Ms. Donaldson, and the jury answered, "Yes." It then asked whether the breach was a proximate cause of her injury, and the jury again answered, "Yes." Based upon the two "Yes" answers, reflecting that the jury had found a breach and causation, the form then instructed the jury to proceed to fill in the amount of damages, if any, it was awarding to Ms. Donaldson. The jury wrote in its award of $3,578,488.98.

The second section, entitled "Special Interrogatories," was a series of six questions requiring a "Yes" or "No" answer concerning whether Dr. Townsend had "breached the standard of care" with respect to (a) "puncturing the uterus on Jan-

uary 8, 2000," (b) "failing to inspect the monopolar cautery equipment [the probe] on January 8, 2000," (c) "failing to appropriately inspect the bowel on January 8, 2000," (d) "failing to recommend a CT Scan on January 11, 2000, or January 12, 2000," (e) "failing to hospitalize Kimberly Donaldson earlier than January 13, 2000," and (f) "failing to obtain a consult with another physician earlier than January 13, 2000." The jury found that Dr. Townsend had breached the standard of care with respect to four of the six special interrogatories: inspection of the bowel, failing to recommend a CT Scan, failing to hospitalize the plaintiff earlier than January 13, 2000, and failing to consult with another physician earlier than January 13, 2000.

■ Dr. Townsend argues that this verdict form was insufficient. We are compelled to agree. The General Verdict portion of the form inquired whether or not Dr. Townsend had breached the applicable standard of care and whether that breach was a proximate cause of injury to Ms. Donaldson. The special interrogatories asked only whether Dr. Townsend had violated the standard of care as to each theory. While the jury found four separate breaches of the standard of care, we have no way of knowing which ones (or one) the

jury found to be a proximate cause of injury in the absence of a verdict form that specifically tells us. *See District of Columbia v. White,* 442 A.2d 159, 165 (D.C. 1982); *see also Hubbard v. Chidel,* 790 A.2d 558, 567 (D.C.2002). In other words, the jury's "Yes" answer in response to the general interrogatory about whether or not the jury had found proximate cause does not establish that the jury found proximate cause with respect to *each* of the four breaches of the standard of care.[8]

Thus, as we explain, Ms. Donaldson is in the same position as the appellant in *White.* In that case, the plaintiff sued the District of Columbia under the Wrongful Death Act[9] alleging, in relevant part, that the decedent's death resulted from a Metropolitan Police Department detective's negligent use of excessive force. *White, supra,* 442 A.2d at 161. The trial court submitted two theories of liability to the jury: (1) that the District was negligent in training the detective, and (2) that the District was vicariously liable for the detective's negligence. *Id.* at 165.

We found that there had been insufficient evidence presented upon which to submit the negligent training issue to the jury, and that this undermined the validity

---

8. We note that the verdict form submitted by Dr. Townsend would have cured this issue by specifically inquiring of the jury with respect to each alleged breach of the standard of care found whether the jury also found that particular breach was a proximate cause of Ms. Donaldson's injury. In discussing the jury form, the trial judge explained, "My objective was to try and give the jury a verdict form that was not so elaborate that they would find it just too daunting to deal with and yet one that would allow them to tell us what they thought the evidence proved or failed to prove." In our view, this goal was attainable. While Dr. Townsend's proposed form would have eliminated the problem created here, the form actually used would also have been sufficient had the court asked in the Special Inter-

rogatories, "Did Dr. Townsend breach the standard of care and thereby proximately cause the plaintiff's injuries by failing to [take the action that formed the basis for each breach of the standard of care]?" *Cf. Nimetz v. Cappadona,* 596 A.2d 603, 608 (D.C.1991) (Relying on the estoppel rule, the Court of Appeals held that "a defendant who fails to request a special verdict form in a civil case will be barred on appeal from complaining that the jury may have relied on a factual theory unsupported by the evidence when there was sufficient evidence to support another theory properly before the jury.")

9. D.C.Code § 16–2701 *et seq.* (2001).

of the jury finding. In remanding for a new trial, the court explained:

> [W]e do not know whether the verdict rests on a permissible or impermissible theory of liability. Where there are several theories of liability, one of which is impermissible, and the court "cannot determine on which theory of liability the jury relied when finding in favor of the appellant, leaving open the possibility that it may have relied on the impermissible one, the case must be remanded for retrial."

*Id.* at 165 (quoting *Murphy v. United States*, 209 U.S.App.D.C. 382, 391, 653 F.2d 637, 646 (1981)); *see also Hubbard*, *supra*, 790 A.2d at 567. Since we do not know which of the breaches of the standard of care the jury concluded proximately caused the harm to Ms. Donaldson, we must reverse unless all of the theories would be permissible.

Ms. Donaldson argues that there is no ambiguity in the verdict form because the trial judge properly instructed the jury that, to be entitled to their verdict, Ms. Donaldson had to prove, "(1) What is the standard of skill and care that reasonably competent professionals follow when acting under the same or similar circumstances; (2) That the defendant ... did not follow that standard of skill and care; and (3) That by not following that standard of skill and care, the defendant's ... conduct was a proximate cause of injury to the plaintiff." Standardized Civil Jury Instructions for the District of Columbia, No. 9–3 (2002 ed. rev.) "Hence," Ms. Donaldson urges, "without the conduct being a proximate cause of injury, there could be no breach of the standard of care."

Ms. Donaldson's position is not supported by the plain language of Jury Instruction 9–3, listing three separate elements necessary for a finding of liability. *See also Psychiatric Inst. of Washington v. Allen*, 509 A.2d 619, 623–24 (D.C.1986) ("In a medical malpractice case, the plaintiff must prove ... that there was an applicable standard of care, that the defendant breached that standard, *and that the breach was a proximate cause of the plaintiff's injuries*.") (emphasis added). Nothing in the instruction given by the trial court would foreclose the jury from finding that the appellant had breached the four standards of care indicated, but that not all of the breaches were a proximate cause of her injuries. Therefore, in this case, the jury may have found a breach on four of the theories submitted to it, but found proximate causation on as few as one.

■ For the forgoing reasons, we hold that the verdict form employed by the trial court is insufficient to show which of the breaches of the standard of care the jury found proximately caused the harm to Ms. Donaldson. Thus, under *White*, should we conclude that there was even one theory of liability submitted to the jury for which there was insufficient evidence, the verdict in this case must be set aside. We begin by addressing Dr. Townsend's arguments that the trial court erred in admitting Dr. Bechamp's standard of care testimony and then examine if there was sufficient properly-admitted evidence on each theory of liability to support the verdict. *White*, *supra*, at 442 A.2d at 165.[10]

10. We do not reach Dr. Townsend's final issue with respect to Ms. Donaldson's verdict form. That issue pertains to what he refers to as a confusing special interrogatory concerning his inspection of the small bowel. As his counsel conceded at oral argument, this issue was never raised at trial, thus providing no opportunity for the judge to correct any error before sending the case to the jury. While Dr. Townsend's proffer of his own verdict

### III. Dr. Bechamp's Standard of Care Testimony

■ The decision of whether to allow expert testimony is within the sound discretion of the trial court. *District of Columbia v. Anderson,* 597 A.2d 1295, 1299 (D.C.1991). In exercising this discretion, however, the court must act within the proper legal framework. *See Gubbins v. Hurson,* 885 A.2d 269, 278–79 (D.C.2005). Dr. Townsend makes two main arguments in support of his position that Dr. Bechamp's testimony from the *de bene esse* deposition testimony [11] should have been excluded: (1) it was outside the scope of the Hospital's Rule 26(b)(4) statement and (2) Dr. Bechamp changed without notice his testimony that Dr. Townsend violated the standard of care [12] by failing to hospitalize Ms. Donaldson on January 11th. The objections to Dr. Bechamp's standard of care testimony are based on claims of unfair surprise and undue prejudice. We address first the legal standard applicable to a claim of surprise and prejudice, and then the argument that the standard of care testimony should have been excluded because it was outside the Hospital's Rule

26(b)(4) statement. We conclude that Dr. Townsend suffered neither undue surprise nor undue prejudice from its admission. We then address separately his argument pertaining to Dr. Bechamp's testimony that Dr. Townsend breached the standard of care by not hospitalizing Ms. Donaldson on January 11th.

### A. The Trial Court's Decision to Allow Dr. Bechamp to Testify on Standard of Care Issues

In *Weiner v. Kneller,* 557 A.2d 1306 (D.C.1989) we reversed the trial court for excluding testimony omitted from a Rule 26(b)(4) statement despite the fact that the appellant had notified the other side nine days before to anticipate this testimony. *Weiner* set out five factors for a trial court to consider when confronted with a claim of surprise and prejudice:

"(1) whether allowing the evidence would incurably surprise or prejudice the opposite party; (2) whether excluding the evidence would incurably prejudice the party seeking to introduce it (3) whether the party seeking to introduce the testimony failed to comply with the

form was sufficient to preserve his general objection to Ms. Donaldson's form, a party that fails to object to specific wording in a special verdict form at trial waives that issue for appeal. *Saman v. Robbins,* 173 F.3d 1150, 1155 (9th Cir.1999) (citing *United States v. Parsons Corp.,* 1 F.3d 944 (9th Cir.1993); *McDaniel v. Anheuser–Busch, Inc.,* 987 F.2d 298, 306 (5th Cir.1993); *Golub v. J.W. Gant & Assoc.,* 863 F.2d 1516, 1520–21 (11th Cir. 1989); *In re Innovative Constr. Sys., Inc.,* 793 F.2d 875, 882 (7th Cir.1986); 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 49.11[5][b] (3d ed. 1997)). The policy behind this rule, providing the trial court with notice and an opportunity to correct so that a verdict is not jeopardized, applies with particular force here, where the jury sat for over two weeks on a case involving numerous witnesses that had taken several years to prepare.

**11.** Dr. Bechamp gave two depositions in connection with this case. The first was a discovery deposition taken approximately one year before trial. The second was a *de bene esse* deposition taken during the trial, when pressing medical commitments prevented him from returning to testify for a second day after he had testified before the jury about his expert qualifications and briefly about substantive issues. The parties continued his testimony that evening at the *de bene esse* deposition. The following day, the parties presented their objections from that deposition to the trial judge, who granted certain requests to redact portions and denied others.

**12.** While the term "standard of care" is not actually used in the question posed to Dr. Bechamp or in his answer, Dr. Townsend refers to the answer as a standard of care opinion in his brief and we agree.

evidentiary rules inadvertently or willfully; (4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and (5) the impact of excluding the proposed testimony on the completeness of information before the court or jury."

*Id.* at 1311–12. Application of those factors in this case leads us to conclude that the trial court did not err in admitting Dr. Bechamp's testimony. We begin with the question of surprise and prejudice.

### 1. *Surprise and Prejudice*

At his *de bene esse* deposition, Dr. Bechamp gave opinions about the standards of care governing Dr. Townsend's performance of the bowel inspection and his failure to consult with another doctor in a timely fashion. Dr. Townsend's primary complaint is that the Hospital's Rule 26(b)(4) statement indicated that Dr. Bechamp would testify only as to "the issues of causation and damages," and thus, he argues, the standard of care testimony was outside the scope indicated and therefore should have been excluded. This argument is unsupported by the record.

The Hospital's Supplemental and Amended Rule 26(b)(4) statement set out the following anticipated testimony from Dr. Bechamp:

He is further expected to testify that the small bowel cannot be visually inspected for damage in its entirety by means of a laparoscopy, and that the *standard of care* requires a laparotomy so that the bowels can be handled or visually inspected. He is further expected to testify that in connection with the plaintiff's readmission to Sibley Hospital, Dr. Townsend should have told Dr. DeRosa that he had removed some yellow tissue, believed to be fat, at the time the uterus was perforated, and he will comment on how this may have influenced the patient's management. Dr. Beauchamp [sic] *will be asked to respond to and rebut at trial the specific opinions of the experts of other parties hereto.*

(Emphasis added). Thus, contrary to Dr. Townsend's claims, the Hospital's Rule 26(b)(4) statement did disclose that Dr. Bechamp was expected to testify on standard of care issues,[13] the plaintiff's readmission to the Hospital, and Dr. Townsend's consultation with Dr. DeRosa. While the Rule 26(b)(4) statement "leaves room for testimony" on these issues, "even assuming that [the Hospital's] Rule 26(b)(4) statement was defective in this respect, we find no basis for reversal" because the circumstances presented here satisfy the *Weiner* test. *Kling v. Peters*, 564 A.2d 708, 714 (D.C.1989) (affirming a trial court's decision to admit expert testimony on causation where the relevant Rule 26(b)(4) statement said only that he "[would] focus upon the failure of the defendant . . . to render appropriate and adequate medical care and treatment").[14]

---

**13.** Dr. Townsend contends, "The Hospital reported that Dr. Bechamp would testify that the requisite standard of care required a laparotomy to inspect Ms. Donaldson's bowel, but Dr. Bechamp did not testify on this issue at trial. He instead testified about the standard of care for conducting laparoscopy." While this may be true, both procedures are mentioned in the context of standard of care testimony. This, in conjunction with the statement that Dr. Bechamp would "respond to and rebut at trial the specific opinions of the experts of other parties hereto," leads us to conclude that the trial court did not abuse its discretion in admitting Dr. Bechamp's testimony.

**14.** *See also Weiner, supra,* 557 A.2d at 1311 ("Certainly, it would be imposing too great a burden to require a party to describe, in a Rule 26(b)(4) statement, every possible direction his expert's testimony could take. Courts have generally allowed experts to state the natural concomitants of their arguments, including rebuttals of contrary expert testimo-

■ Dr. Bechamp's testimony did not unduly surprise Dr. Townsend. The Hospital disclosed in the Joint Pretrial Statement that Dr. Bechamp "is expected to render opinion testimony consistent with [the Hospital's] Rule 26(b)(4) Statement *and his deposition.*" (Emphasis added). At his discovery deposition, Dr. Bechamp had testified repeatedly about standard of care issues. *See id.* at 714–15. Moreover, as Dr. Townsend concedes in his brief, the adversarial nature of the two defendants during trial alerted him that the Hospital might solicit expert testimony that he had violated the standard of care. In any event, a trial judge is not required to enforce the strict letter of a pretrial statement or 26(b)(4) statement as long as it determines that allowing expert testimony will not constitute unfair surprise at trial. *See Bushong v. Park,* 837 A.2d 49, 54 (D.C.2003) ("Regardless of what the pretrial statement might or might not say about the expected testimony of an expert witness ... the witness' testimony is properly admitted, notwithstanding any failure to mention certain words in the pretrial documents, if the actual testimony does not surprise the opposing party.").[15] Given Dr. Bechamp's prior statements addressing standard of care issues and the adversarial nature of the co-defendants at trial, we conclude that the admission of this testimony should not have unduly surprised Dr. Townsend.

Furthermore, Dr. Townsend was not unduly prejudiced by Dr. Bechamp's testimony. Ms. Donaldson had cross-designated Dr. Bechamp as her expert and had listed him in the Joint Pretrial Statement—a document signed by Dr. Townsend's counsel—as one of her witnesses. She described him as "an expert witness for Defendant Sibley Memorial Hospital [who] may be called to testify on [the] breach of the standard of care as to both Defendants, as well as causation and damage issues." Thus, even if the trial court had not permitted the Hospital to ask Dr. Bechamp about the standard of care, Ms. Donaldson could have done so in accordance with her designation of him as a witness.

■ Dr. Townsend argues specifically that the trial court's ruling prejudiced him because the court had previously precluded one of his experts, Dr. Fitzpatrick, from giving standard of care testimony regarding hospitalization. Even assuming this is true, Dr. Townsend has waived that argument because he failed to ask the trial judge for permission to recall Dr. Fitzpatrick in order to mitigate the harm. *See 2101 Wisconsin Assocs. v. D.C. Dep't of Employment Servs.,* 586 A.2d 1221, 1225 (D.C.1991) ("Petitioner never sought to recall claimant as a witness, and hence cannot claim prejudice from the examiner's restrictions."). *See generally Williams v. Gerstenfeld,* 514 A.2d 1172, 1177 (D.C. 1986) ("As a general rule, matters not properly presented to a trial court will not be resolved on appeal.").

Dr. Townsend asserts that recalling Dr. Fitzpatrick would have prejudiced him with the jury by extending the trial into the holidays, and cites the First Circuit

ny, when they have been satisfied that such testimony was of a piece with the original theory.").

**15.** *See also Corley v. BP Oil Corp.,* 402 A.2d 1258, 1262 (D.C.1979) ("Although we agree with the general requirement to restrict parties to the issues framed by the pretrial order, we do not believe a party must recite all

testimony therein on those issues in order to avoid being precluded from offering such evidence at trial. While the purpose of pretrial orders, like the discovery process, is to minimize unfair surprise at trial, rigid adherence to the pretrial order is not always exacted.") (internal quotation marks omitted).

case of *Alberty–Vélez v. Corporación de Puerto Rico para la Difusión Pública*, 242 F.3d 418, 426 (1st Cir.2001).[16] But at the time of the testimony at issue, Christmas was still over a week away and Dr. Fitzpatrick's office was nearby in Baltimore. Moreover, by not making the request, he foreclosed the possibility that the trial court could have fashioned an alternative solution. A party who fails to seek permission to recall a witness is on weak ground when he later asserts prejudice. Therefore, because we conclude that Dr. Bechamp's testimony did not "incurably surprise" Dr. Townsend, and that he did not preserve his claim of prejudice with respect to Dr. Fitzpatrick,[17] the first prong of the *Weiner* test is satisfied.

## 2. *Incurable Prejudice to the Hospital*

Regarding the second prong of the *Weiner* test—whether excluding the evidence would incurably prejudice the party seeking to introduce it—we conclude that the evidence was highly relevant to the Hospital's case and its efforts to show that Dr. Townsend's actions were the proximate cause of Ms. Donaldson's injuries. Dr. Townsend urges that the standard of care testimony was not relevant to the Hospital's defense because the Hospital "did not need to establish that Dr. Town-

send breached the standard of care to defeat Ms. Donaldson's claim." While it may not have been necessary for the Hospital to prove that Dr. Townsend violated the standard of care in order to show that it was not liable, such testimony was certainly relevant to its defense. *See, e.g., Plough, Inc. v. Nat'l Acad. of Sciences*, 530 A.2d 1152, 1158 (D.C.1987) (testimony is relevant when "it has a 'tendency to make the existence of [a] fact that is of consequence to the determination of the action ... more probable ... than it would be without the evidence.'") (quoting FED. R.EVID. 401). A breach of the standard of care by Dr. Townsend could have led the jury to conclude that this breach was an intervening factor and that, therefore, any breach by the Hospital was not a proximate cause of Ms. Donaldson's injuries. *See, e.g., District of Columbia v. Zukerberg*, 880 A.2d 276, 281 (D.C.2005) ("This court has defined proximate causation as that cause which, in natural and continual sequence, *unbroken by any efficient intervening cause,* produces the injury and without which the result would not have occurred.") (emphasis added) (citing *St. Paul Fire & Marine Ins. Co. v. James G. Davis Constr. Corp.*, 350 A.2d 751, 752 (D.C.1976)).

16. *Alberty–Velez* is clearly distinguishable. In that case, the First Circuit found that the trial court had erred in admitting critical evidence. We have found no evidence that was erroneously admitted in this case. Furthermore, the *Alberty–Velez* court noted that, in order to respond to the new evidence admitted, the plaintiff would have been forced to call multiple new witnesses causing a substantial delay in the trial. *Id.* at 426. Only one witness, Dr. Fitzgerald, needed to be recalled in this case. We also note that the First Circuit has held in a different case that "the proper remedy [for the erroneous admission of evidence] was a request for a continuance even when the case was being tried to a jury ... where some delay in the trial would have been a feasible

remedy." *Id.* at 425 (citing *Newell Puerto Rico v. Rubbermaid, Inc.*, 20 F.3d 15, 20 (1st Cir.1994)).

17. Dr. Townsend also argues that the trial court's decision to admit this testimony was prejudicial because "it was the only evidence of breach of the standard of care on several of [Ms. Donaldson's] claims." This point conflates two separate issues. While the evidence may have been admissible under the discovery rules, Dr. Townsend asserts that the trial court improperly allowed Ms. Donaldson to make her *prima facie* case on the testimony of this adverse expert witness. We will address this issue below.

### 3. The Other Three Weiner Prongs

The remaining prongs of *Weiner* require only brief analysis. As to the third prong—whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully—Dr. Townsend claims that the language of the Rule 26(b)(4) statement was a willful effort to deceive him. *See Adkins v. Morton*, 494 A.2d 652, 660 (D.C. 1985). The record does not support this conclusion. Rather than leave the term "standard of care" out of its statement entirely, the Hospital stated that Dr. Bechamp would provide such testimony and cross-referenced his pre-trial deposition, in which he discussed standard of care issues at length. *Cf. Kling, supra*, 564 A.2d at 714. With respect to the fourth prong—whether there was an adverse effect on the orderliness or efficiency of the trial—no such showing has been made. Finally, with respect to the fifth prong—the impact of excluding the testimony on the completeness of information before the jury—this consideration strongly supports the trial court's decision to admit Dr. Bechamp's testimony.

### B. Dr. Bechamp's Changed Standard of Care Testimony

■ Dr. Townsend also contends that Dr. Bechamp's testimony—elicited by Ms. Donaldson on cross-examination at Dr. Bechamp's *de bene esse* deposition—that the standard of care required Ms. Donaldson to be hospitalized by January 11th changed from his discovery deposition testimony taken approximately a year before, and that this change constitutes unfair surprise. This argument does not withstand scrutiny.

At his discovery deposition Dr. Bechamp initially testified that, within a reasonable degree of medical certainty, Ms. Donaldson should have been hospitalized by January 11th. Under cross-examination, Dr. Bechamp stated that the standard of care *did not require* hospitalization, though it did require further evaluation on January 11th. In contrast, at his *de bene esse* deposition, Dr. Bechamp testified that the standard of care *did require* that Ms. Donaldson be hospitalized by January 11th.[18] When confronted with this apparent contradiction, Dr. Bechamp acknowledged, "I would change that answer, based on the fact I did have an opportunity to review the x-rays. [At the time of my discovery deposition] [a]ll I had was a typewritten report. And when I looked at the x-rays—when I saw the x-rays I would change my answer to that question." Dr. Bechamp also acknowledged that he had first seen the x-rays several weeks before the *de bene esse* deposition.

Although Dr. Bechamp's testimony regarding the standard of care for hospitalizing Ms. Donaldson changed from his initial deposition, we conclude that the trial court did not abuse its discretion in admitting this testimony. While Dr. Bechamp did not testify during the discovery deposition that the standard of care *required* hospitalization on January 11th, he did testify, to a reasonable degree of medical certainty, that Dr. Townsend *should* have hospitalized her at that time. This "changed testimony" at the *de bene esse* hardly constitutes a startling reversal under the circumstances. Furthermore, Dr. Bechamp asserted in his discovery deposition that the standard of care required further follow-up testing on January 11th. Therefore, his overall position that Dr. Townsend had violated the standard of care was consistent because Dr. Townsend did not conduct such testing in a timely fashion. Read in its entirety, Dr. Bechamp's

---

**18.** See note 12, *supra*.

changed testimony was only marginally inconsistent with his original deposition.

Finally, as the trial court noted, Dr. Townsend was able to use Dr. Bechamp's inconsistent testimony from his discovery deposition to impeach him at the *de bene esse* deposition, mitigating any prejudicial effect the change in testimony may have had. The trial court also instructed the jury about prior inconsistent statements as part of the jury instruction on impeachment. *See* Standardized Civil Jury Instructions for the District of Columbia No. 3.08 (2002 ed. rev.).

In addition to his claim of surprise, Dr. Townsend urges that Dr. Bechamp's testimony was particularly prejudicial to him because it was the only evidence that he violated the standard of care by not hospitalizing Ms. Donaldson on January 11th. This is inaccurate. Ms. Donaldson's expert, Dr. London, testified that the standard of care required Dr. Townsend, as of

January 11, 2000, to do "[o]ne of two things. Hospitalize her for evaluation or observation ... or diagnostic procedures [like a CT scan]."[19] Given the marginal nature of the inconsistency, the ability to impeach the testimony with the prior testimony, the trial court's instructions, and the lack of prejudice, we conclude that there was no error it its admission.[20]

## IV. Dr. Townsend's Motion for a Judgment as a Matter of Law

### A. *Rule 50*

■ Dr. Townsend's next argument is that the court erred in not granting his Super. Ct. Civ. R. 50 motion for judgment as a matter of law at the close of Ms. Donaldson's case-in-chief, and that as a result, Ms. Donaldson was not entitled to use any of the testimony that came in through either Dr. Townsend or the Hos-

19. Dr. Townsend attempts to dismiss this testimony by focusing on Dr. London's cross-examination. In that cross, Dr. Townsend asked, "But you are not giving an opinion that the standard of care required Dr. Townsend on Tuesday, the 11, to put [Ms. Donaldson] in the hospital, correct?" Dr. London replied, "Correct, just that something needed to be done." This answer, however, should be read in conjunction with Dr. London's answer on direct. Because Dr. Townsend took no further action at that time, the jury could infer that Dr. Townsend's failure to hospitalize Ms. Donaldson violated the standard of care.

It is worth noting that Dr. London's opinion is fairly consistent with that of Dr. Bechamp, though Dr. Bechamp ultimately concluded that hospitalization was necessary without the qualifier that something else could have been done. Thus, even if this court concluded that the trial court erred in admitting Dr. Bechamp's testimony, Dr. London's testimony would have minimized the prejudice to Dr. Townsend from that error.

20. Moreover, we find *Voegeli v. Lewis*, 568 F.2d 89, 96 (8th Cir.1977), relied upon by Dr.

Townsend in support of his argument that this testimony should have been excluded, to be unpersuasive. Apart from the fact that *Voegeli* is not controlling precedent, it involved a situation where discovery had been limited by the trial court "substitut[ing] the right of deposition for full and complete answers to interrogatories." *Id.* No such discovery limitation existed in this case. In addition, unlike Dr. Bechamp, the expert in *Voegeli* changed his testimony based on two academic articles that he had read rather than x-ray evidence that was within the record. *See id.* at 96. Dr. Townsend was not only aware of the x-rays upon which Dr. Bechamp based his opinion, but had called experts of his own that discussed the x-rays and expressed support for Dr. Townsend's actions based thereon. Moreover, the changed testimony here was brought out on cross-examination by Ms. Donaldson. There is no evidence that the Hospital even knew about Dr. Bechamp's changed opinion and no indication that they did anything to conceal that change (such as provide insufficient interrogatory responses). Finally, unlike Dr. Bechamp's *de bene esse* deposition in this case, the changed testimony in *Voegeli* constituted a complete reversal.

pital to make her *prima facie* case. This argument is based on a misreading of Rule 50. That rule reads, in pertinent part:

If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the Court *may* determine the issue against that party and *may* grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

Super. Ct. Civ. R. 50 (emphasis added).

The plain language of the rule demonstrates that the trial court was not obligated to rule at the close of the plaintiff's case. The rule is similar to Super. Ct. Crim. R. 29(b), which provides that the trial court "may reserve decision on a motion for judgment of acquittal, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty." Unlike Super. Ct. Civ. R. 50, Super. Ct. Crim. R. 29(b) requires a judge who has reserved ruling until the close of all of the evidence to judge the motion for judgment of acquittal solely "on the basis of the evidence at the time the ruling was reserved."[21] Thus, whether or not Ms. Donaldson had made out a *prima facie* case by the time that she rested, the trial court was not required to grant the motion.[22]

### B. Ms. Donaldson's Use of Dr. Bechamp's Testimony as *Prima Facie* Evidence

Because the trial court acted within its discretion in denying Dr. Townsend's Rule 50 motion, we must next address his contention that Ms. Donaldson was not entitled to the testimony of the Hospital's expert to establish her *prima facie* case. We disagree. As Wigmore has stated, "[T]he sufficiency of evidence which will defeat [a motion for judgment as a matter of law] may be found in the *opponent's* own evidence...." 9 WIGMORE ON EVIDENCE § 2495 (1981) (emphasis in original). Indeed, we have previously held that an opponent's experts can be used to defeat summary judgment. In *Abbey v. Jackson*, 483 A.2d 330, 331 (D.C.1984), a medical malpractice action, the trial court had granted summary judgment for the defendant on the grounds that the plaintiff had named no experts of her own, but had merely cross-designated the defendant's experts. We reversed the grant of summary judgment, holding that this cross-designation was sufficient to send the matter to trial. It would be unreasonable to permit a plaintiff to rely on an opposing party's expert witnesses to defeat sum-

**21.** Nor does *Clement v. Peoples Drug Store, Inc.*, 634 A.2d 425 (D.C.1993), cited by Dr. Townsend, support his position. *Clement* merely held that because there were no facts or circumstances from which a jury could find for the plaintiff at the close of her case, the trial court had not erred in granting the Rule 50 motion. It did not hold that the court was *required* to grant the motion at that time. Moreover, the trial court here was aware that the plaintiff had cross-designated Dr. Bechamp as her witness, and that she had been unable to subpoena him for trial since he was outside the boundaries of the court's twenty-five-mile subpoena-power. *See* Super. Ct. Civ. R. 45(b)(2).

**22.** Building on the erroneous assertion that Dr. Townsend was entitled to judgment as a matter of law at the conclusion of Ms. Donaldson's case, he argues that the trial court later erred by permitting amendment under Super. Ct. Civ. R. 15(b) to include the postoperative negligence claims. We find this claim to be without merit.

mary judgement and then prohibit the plaintiff from using those experts at trial.

We have, on other occasions, affirmed a grant of summary judgment where a plaintiff failed to designate its own expert, but those cases involved fact patterns that led the trial court to conclude that there was no basis to believe that the defendant's experts would in fact be helpful to the plaintiff at trial. In *Berkow v. Lucy Webb Hayes Nat. Training School for Deaconesses*, 841 A.2d 776, 780 (D.C.2004), for example, we upheld a grant of summary judgment despite the appellant's claim that he could have provided adequate standard of care testimony through the defendants' experts. We found this argument unpersuasive because he had "never notified the defendants that he intended to do so ... and, in any event, there is no record basis ... for believing that [he] could have used defense witnesses to establish the standard of care and defendants' departure from it." *Id.* Similarly, in *Eibl v. Kogan*, 494 A.2d 640 (D.C.1985) (per curiam), we upheld a grant of summary judgment, concluding that "this is not a case in which a plaintiff might reasonably be expected to elicit, on cross-examination, testimony from which a jury might glean support for his contention." *Id.* at 643 n. 2.

The situation here is distinguishable from those in *Berkow* and *Eibl*. There is no question that Ms. Donaldson can elicit helpful expert testimony from Dr. Bechamp. She has already done so. Thus, the fact that the testimony came in through an expert for the Hospital is not a bar to its use by Ms. Donaldson. Moreover, as we noted above, Dr. Townsend recognized before trial that he and the Hospital had conflicting theories of the case. This, coupled with Ms. Donaldson's cross-designation of Dr. Bechamp and her attempt to subpoena him during her case in chief should have put him on notice that such testimony could be forthcoming. Thus, we hold that the testimony of Dr. Bechamp could be utilized by Ms. Donaldson in establishing her *prima facie* case.[23]

### C. *Sufficiency of the Evidence*

 In his final argument concerning his motion for judgment as a matter of law, Dr. Townsend maintains that, even with Dr. Bechamp's testimony, the evidence presented at trial was insufficient to demonstrate causation. On a motion for judgment as a matter of law, "the record must be viewed in the light most favorable to the non-moving party, and that party [here Ms. Donaldson] is entitled to the benefit of every reasonable inference from the evidence." *Washington Metro. Area Transit Auth. v. Jeanty*, 718 A.2d 172, 174 (D.C.1998) (citing *Shewmaker v. Capital Transit Co.*, 79 U.S.App.D.C. 102, 103, 143 F.2d 142, 143 (1944)). "As long as there is some evidence from which jurors could find the necessary elements, a trial judge must not grant a directed verdict." *Marshall v. District of Columbia*, 391 A.2d 1374, 1379 (D.C.1978). "Whether the evidence was sufficient to go to the jury is a question of law, which we consider *de novo.*" *Jeanty, supra,* 718 A.2d at 174.

 With respect to medical malpractice claims, " '[m]edical testimony as to the mere possibility of a causal relation ... is not sufficient standing alone to establish such relation,' particularly where the causation element is unclear." *Talley v. Var-*

23. Dr. Townsend urges that, regardless of Ms. Donaldson's attempt to subpoena Dr. Bechamp during its case-in-chief, she should have noted on the record that she intended to rely on Dr. Bechamp's testimony before she closed her case. While this would have been the better procedure, we do not believe her failure to do so is dispositive given the totality of the circumstances in this case.

ma, 689 A.2d 547, 553 (D.C.1997) (quoting Sponaugle v. Pre–Term Inc., 411 A.2d 366, 368 (D.C.1980)). Thus, Ms. Donaldson needed to show to a reasonable degree of medical probability or certainty that subsequent events leading to her injuries would have occurred differently had Dr. Townsend not violated the standard of care. See Kling, supra, 564 A.2d at 717; Talley, supra, 689 A.2d at 553. As we discussed above, because the jury verdict form was insufficient,[24] the record must reflect adequate causation evidence for each of the four breaches of the standard of care found by the jury.

### 1. Inspection of the Small Bowel

■ During direct examination by the Hospital at the de bene esse deposition, counsel told Dr. Bechamp, "Whenever I ask you a question about your opinion, you can assume I'm going to ask you an opinion to a reasonable degree of medical certainty or probability, so I don't have to keep repeating that."[25] Dr. Bechamp acknowledged that he understood. Immediately thereafter, counsel asked Dr. Bechamp: "Do you have an opinion, sir, as to whether if the small bowel had been inspected in the way you believe it should have been performed, that Ms. Donaldson's course would have been different?" Dr. Bechamp replied: "I think if the perforation had been discovered ... and that had occurred on that Saturday ... they usually have a very benign or uneventful postoperative course. They may stay an extra day or two in the hospital, but basically the rest of the course is uneventful. And certainly, this lady's course was not that way." Counsel for the Hospital then went on to ask a series of questions about whether specific injuries suffered by Ms.

Donaldson would have occurred if the bowel had been inspected properly. Dr. Bechamp answered that neither her respiratory problems, nor her ventilatory problems, nor the scarring to her fallopian tubes would have occurred.

Dr. Townsend argues that Dr. Bechamp's answers in this series of questions were couched in qualifying terms and that the blanket statement at the beginning of the questioning regarding all answers being to a reasonable degree of medical certainty were insufficient to "expertize" the testimony. A close examination of Dr. Bechamp's testimony belies this assertion. Dr. Bechamp's statement, "I think if the perforation had been discovered ... they usually have a very benign or uneventful postoperative course," came immediately after counsel told him that his answers should be to a reasonable degree of medical certainty or probability. Assuming without deciding that counsel's blanket statement that all of Dr. Bechamp's answers should be to a reasonable degree of medical certainty or probability was insufficient to "expertize" all of Dr. Bechamp's answers thereafter, certainly Dr. Bechamp understood that medical certainty or probability was the standard he was being asked to apply in this question, which immediately followed counsel's instruction.

This conclusion is supported by his subsequent testimony regarding specific maladies that Ms. Donaldson suffered. Dr. Bechamp testified that, had Ms. Donaldson been properly diagnosed, she "would not have experienced ... adult respiratory distress syndrome." He further stated, "[I]t's a reasonable certainty that ... [Ms. Donaldson's fallopian] scarring is related

---

24. See pages 287–89, supra.

25. We are troubled by this deposition technique and note that it is highly likely to sow ambiguities that provide the fodder for appellate issues.

to the pelvic abscess she had." These statements are unqualified and confirm that Dr. Bechamp gave his causation testimony on these injuries to a reasonable degree of medical certainty or probability.

### 2. *Failure to Recommend CT Scan or Obtain Consultation January 11th or 12th*

 As with her claim of Dr. Townsend's failure to properly inspect the bowel, Ms. Donaldson relies on Dr. Bechamp's testimony to provide the causation evidence for her theories that Dr. Townsend's failure to recommend a CT scan or obtain a consultation proximately caused her injuries. Still assuming *arguendo* that counsel's blanket statement regarding medical certainty was insufficient to "expertize" all of Dr. Bechamp's testimony, his causation testimony on this point was sufficient to allow the issue to go to the jury.

After establishing that Dr. Bechamp's opinion was that Dr. Townsend should have obtained a CT scan or consulted with another doctor on January 11th, counsel then asked Dr. Bechamp whether he had "an opinion as to how that would have influenced Dr. Townsend's medical course." Dr. Bechamp answered that "if they could have intervened sooner on this lady [they could have] perhaps diminished her postoperative course." At that point, the Hospital sought to clarify that Dr. Bechamp was giving a proper expert opinion. "When you say could [have]," counsel asked, "are you saying that you're just guessing about that, or do you have an opinion—." Dr. Bechamp interrupted the attorney and responded, "My experience would be that you would *certainly*—the patient would do better if you intervened earlier. That's what I'm saying. When

you evaluate a patient with an acute distended abdomen, if you can make a diagnoses of an abscess, with CAT scan, ultra sound, whatever way you make it, you want to intervene as soon as possible." (Emphasis added).

Dr. Bechamp's use of the term "certainly" makes clear that he understood the applicable standard and was utilizing it in his answers, as instructed, without regard to whether the question explicitly asked him whether the causal relationship was to a "medical certainty" or "medical probability." Thus, there was sufficient evidence of causation to send the theories of failing to obtain a CT scan or to seek a consultation to a jury.[26]

### 3. *Failure to Hospitalize Before January 13th*

 Finally, we conclude that there is also sufficient testimony to support the theory that the failure to hospitalize Ms. Townsend before January 13th was a proximate cause of her injuries. As we discussed in note 12, *supra,* Dr. Townsend has conceded that Dr. Bechamp supplied standard of care testimony stating that Dr. Townsend should have hospitalized Ms. Donaldson on January 11th. While Dr. Bechamp is never actually asked whether the failure to hospitalize was a cause of her injuries, this logically follows from his conclusion that further tests or a consultation likely would have prevented her injuries.

Furthermore, Ms. Donaldson's expert, Dr. London, testified that, even if a surgeon had waited two days to conduct surgery on Ms. Donaldson, her injuries would have been greatly reduced if Dr. Townsend had hospitalized her on January 11th rather than waiting until January 13th. The testimony of Drs. Bechamp and Lon-

---

26. Ms. Donaldson maintains that her expert, Dr. London, also testified that a CAT scan would have led to immediate surgery. While

this is certainly a plausible reading of the testimony, Dr. London never directly stated that opinion.

don, read together, provides the requisite evidence of causation on this issue.

For the reasons stated herein, we hold that the trial court did not err in allowing the jury to determine liability based on the testimony presented. Because we find no error regarding the other issues before us,[27] the insufficient jury form did not undermine the verdict rendered at trial. For the foregoing reasons, the judgment of the trial court is

*Affirmed.*

---

**27.** There are overlapping issues presented in this case that contributed to some degree of repetition in the parties' briefs. To the extent that an issue is not explicitly addressed herein, we have considered it and found it to be without merit.